[Civ. No. 10902. Third Dist. Aug. 6, 1965.]

G. KEITH KENWORTHY et al., Plaintiffs, Cross-defendants and Respondents, v. STATE OF CALIFORNIA, Defendant, Cross-complainant and Appellant.

Stanley Mosk and Thomas C. Lynch, Attorneys General, Paul M. Joseph and Milos Terzich, Deputy Attorneys General, for Defendant, Cross-complainant and Appellant.

Herbert F. Kaiser for Plaintiffs, Cross-defendants and Respondents.

PIERCE, P. J.—On November 15, 1960, plaintiffs[1] and defendant, State of California, entered into a written contract by the terms of which Kenworthy agreed to construct a building and the state agreed to rent it for a term of 30 months. The building was never built. Kenworthy, contending that the state's breach of contract prevented him from building, brought this action to recover his alleged loss of profits. The state denied any breach and cross-complained for its alleged damages from Kenworthy's failure to perform. A jury verdict awarded Kenworthy the full amount asked for in argument—$219,000. The trial court, in denying the state's motion for a new trial, conditioned denial upon plaintiffs' remission of $95,600. They consented. The state appeals, its contentions being: (1) the complaint failed to state a cause of action and its general demurrer should have been sustained; (2) no substantial evidence supports the judgment; (3) a new trial should have been granted for plaintiffs' counsel's misconduct. We reject the first contention, find instances of serious prejudicial misconduct but also hold that no substantial evidence supports the jury's verdict.

The framework within which plaintiffs were required to prove a case was their first cause of action of their amended complaint.[2] In it the contract of November 15, 1960, is pleaded and attached as Exhibit A. Its provisions material to this controversy are: Plaintiffs leased to the state (acting through the Director of Finance) a one-story class A building to be built by plaintiffs, containing 52,122 net square feet of office space, together with parking facilities, for the term of 30 months (with an option for renewal) at a rental of $16,000 per month. By the standard (printed) provisions plaintiffs agreed to furnish at their expense service and utilities, maintenance and repair. Time was made of the essence in the

[1]Plaintiffs are husband and wife. All dealings between the parties were transacted by the husband. Throughout this opinion we shall usually refer to ''Kenworthy.''

[2]A nonsuit was granted on plaintiffs' pleaded second cause of action of anticipatory breach.

performance of all of plaintiffs' obligations. By special provisions the lease was to commence upon completion of the building and occupancy. Proposed plans and specifications were attached and made a part of the lease. Plaintiffs were required to supply to the state working drawings on or before 30 days after the date of the lease (November 15, 1960). They were required to commence construction upon receipt of "notice of approval of said drawings by State" and to complete construction within six months thereafter. In the event that the work was not completed within that time limit, the state at its option could either terminate the lease and be relieved of further obligations, complete the building at lessor's expense, or "Rely upon Lessor's covenant to complete said improvements, subject to the provisions of paragraph 21 hereof." Paragraph 21 provided that if the improvements had not been completed within the time provided and the state did not elect to terminate the lease, "Lessor will pay to the State the sum of $600.00 for each and every day of such delay." Paragraph 22 of the lease provided: "The date for completion of said improvements shall be extended for a period equal to the time the Lessor is delayed in said construction work by (a) acts of the State, its agents or employees. . . ."

Having pleaded the contract, the gravamen of plaintiffs' complaint was that after it had been signed and after working drawings had been submitted the state "on January 25, 1961 . . . made or directed plaintiffs to make changes, modifications and revisions in the said working drawings in order to change, modify and revise portions of the said building's electrical system and air conditioning system." It is then alleged that by reason of said changes, plaintiffs were not able to begin construction upon receipt of the state's purported notice of approval of the working drawings but were required to modify them to conform to the changes with the "proximate result that plaintiffs were delayed in the construction of said building." Plaintiffs, therefore, it is alleged, on March 30, 1961, requested the state, under the terms of paragraph 22 of the lease as stated, to extend the date of the completion "for a period equal to the time plaintiffs were delayed" by said acts of the state. The state refused that request. It is further alleged that "plaintiffs have been ready, willing and able to carry out their part of the terms of said agreement but have been prevented" from so

doing in that "plaintiffs' lenders refused to make the necessary construction loans for said building until defendants, and each of them,[3] extended the date for completion of said building . . . for a period equal to the time plaintiffs were delayed in the construction of said building by the said changes, modifications and revisions. . . ." Plaintiffs alleged a loss of profits of $510,000.

A general demurrer to this count of the complaint was overruled.

The state's argument that no cause of action has been pleaded is predicated upon the contention that Kenworthy's obligation to commence and complete construction of the building and the state's obligation not to cause delay were not mutually dependent and therefore the state's default, if any, would not excuse Kenworthy's failure to build. With that proposition we cannot agree.

■ In *Peter Kiewit Sons' Co.* v. *Pasadena City Junior College Dist.*, 59 Cal.2d 241 [28 Cal.Rptr. 714, 379 P.2d 18], it was held that where a contractor is delayed in the construction of a building by acts of the owner, he is entitled to an extension of time to complete equal to the delay. Although this rule was stated in a case in which the question was whether the contractor was relieved from the burdens of a liquidated damage provision of a contract, the reason for the rule should be equally applicable to any case where a question of the contractor's excuse for nonperformance within a time fixed by the contract is properly raised.

■ It is also settled that, where delays are caused by defendant's breach, a contractor is not only excused from performance of a contract within the time specified, but is also entitled to damages. (*McGuire & Hester* v. *City & County of San Francisco*, 113 Cal.App.2d 186 [247 P.2d 934]; *Milovich* v. *City of Los Angeles*, 42 Cal.App.2d 364 [108 P.2d 960].)

The state argues that the rule just stated has no application when it is sought to be invoked in a case where the contractor has not performed. Cited by the state is the early case of *Cox* v. *McLaughlin* (1880) 54 Cal. 605, holding that nonpayment of an installment by one party to a construction contract did not constitute prevention of performance by the contractor. Later cases, however, have commented upon and greatly limited the rule of the *Cox* case. For example, in *Big*

---

[3]Doe defendants were named; none was served.

*Boy D Corp., Ltd.* v. *Etheridge* (1941) 44 Cal.App.2d 114, at page 118 [111 P.2d 953], quoting from *Fountain* v. *Semi-Tropic Land & Water Co.* (1893) 99 Cal. 677, at pp. 680, 681 [34 P. 497], the court says:

" 'If the covenant be of minor importance, not going to the root of the matter, and one that can be readily compensated in damages, the party injured cannot rescind, but must perform his part of the contract and seek compensation in damages. If, however, the breach be of a covenant, the nonperformance of which will render it impossible for the other party to perform, or will frustrate the whole purpose of the contract on his part, he still has two courses open to him. . . . He may, acting promptly, rescind and recover moneys laid out and expended, or paid, and the value of labor performed and materials furnished under the contract; or he may decline to proceed in performance and sue for damages, in which case he may recover all loss occasioned by the breach—including profits he would have made if the contract had been performed. . . .' "

In this contract there was, of course, no express covenant that delays caused by the state would constitute a prevention of performance, but there was, as the facts were pleaded, an implied covenant, that the state would not impair Kenworthy's ability to obtain financing by withholding consent to an extension necessitated by delays caused by the state.

It is a general rule that "Stipulations which are necessary to make a contract reasonable, or conformable to usage are implied, in respect to matters concerning which the contract manifests no contrary intention." (Civ. Code, § 1655.)

In every building contract which contains no express covenant to the contrary, there is an implied contract that "the contractor shall be permitted to proceed with the construction of the building in accordance with the other terms of the contract without interference by the owner. . . ." (*Gray* v. *Bekins*, 186 Cal. 389, 395 [199 P. 767].)

". . . There is implied in every contract a covenant by each party not to do anything which will deprive the other parties thereto of the benefits of the contract. (Citing cases.) This covenant not only imposes upon each contracting party the duty to refrain from doing anything which would render performance of the contract impossible by any act of his own, but also the duty to do everything that the contract presupposes that he will do to accomplish its purpose."

(*Harm* v. *Frasher* (1960) 181 Cal.App.2d 405, 417 [5 Cal. Rptr. 367].)

That covenant, called a covenant of "fair dealing" (see 1 Witkin, Summary of Cal. Law (1960) p. 271) is present here. There can be no doubt that the parties (as the facts related below will show) contemplated that Kenworthy would have to obtain financing before he could commence construction. And while not every breach of a covenant of fair dealing creates an impossibility of performance (see *Gray* v. *Bekins, supra,* 186 Cal. 389, 395), it is obvious that a refusal by the state to extend Kenworthy's time to perform under the circumstances alleged *if proved* would have made it impossible for him to commence construction.

We determine that a cause of action was sufficiently pleaded to withstand general demurrer.

We turn then to a consideration of the other contentions on appeal: (1) Does the record disclose substantial evidence to support the verdict? (2) Was there misconduct, and if so was it prejudicial? We will discuss these questions in their order of statement. To make treatment thereof meaningful, a somewhat detailed chronological statement of the not-too-easily explicated facts is necessary.

The lease between the parties dated November 15, 1960, provisions of which have been outlined above, had been preceded by a call for bids. Kenworthy was the lowest bidder.

He had been a licensed contractor for five years. During this period his contracting had been confined to the construction of homes, his most recent work having been development of a subdivision of which he was a part owner. The tract houses had not sold. At the time of his contract with the state, Kenworthy's sole assets were equities in these homes. He was delinquent in his construction loan payments, notices of default had then been given or were given shortly thereafter, and in the spring of 1961 foreclosure by sale was completed. His obligations in November 1960 included a debt on a promissory note for $6,000, plus interest (on which a judgment was later obtained); he owed the contractors' union retirement and vacation fund $3,500 (a part of his obligations to workmen hired on his construction jobs). In short, he was insolvent.

In October 1960, when the state's call for bids had been made, the state was in urgent need of the building proposed to be built and rented. The Bureau of Criminal Identification and Investigation for which it was being obtained was oc-

cupying leased premises under badly-overcrowded conditions. This call for bids had been preceded by an earlier one under which no acceptance and contract had resulted. This had caused additional delay. Prior to the receipt of bids under the later call officers of the state had had negotiations with Kenworthy and with other prospective bidders. During these negotiations the urgent needs of the state were stressed. Kenworthy's bid, and presumably the others, contained the following provision on the bid form: "I further agree in this bid to meet the time element with respect to the occupancy date as will be established by your department."

The state, acting through the Director of Finance, did not immediately accept Kenworthy's bid. It did not have complete knowledge of Kenworthy's financial condition (and Arthur Collins, assistant director, admitted at the trial that an inadequate check thereof had been made). Kenworthy had been asked to furnish a faithful performance bond. He told the state officials he was unable to furnish one, since a bond covering the proposed type of lease would cost him several thousand dollars. The state officials then stated that if Kenworthy would agree to complete the building within six months from approval of working drawings with a "liquidated damages" clause as later included in the agreement the state would be satisfied. Kenworthy expressed no objection to this arrangement. He stated that he could build the building in four months. (Another factor which may or may not have motivated the state in accepting Kenworthy's bid was a letter from State Mortgage Company, dated November 9, 1960, stating that Kenworthy's application for a $300,000 "permanent" loan "has been favorably considered.")

The lease was drawn and signed November 15, 1960.

Kenworthy did not own the site upon which the building was to be constructed. It was owned by one Charles Jensen. Kenworthy produced in evidence a written ground lease with Jensen dated November 4, 1960. It was for a 55-year term, at $15,600 per year (with a purchase power of dollar escalation clause). Rent was to commence upon building completion. The lease recited that it was given in consideration of the payment of $5,000. It provided for Kenworthy's execution of a bond in the sum of $400,000 conditioned that Kenworthy would construct the building contemplated and pay for same free of all mechanics', labor and materialmen's liens. There was a subordination clause to a mortgage to finance construc-

tion "provided, however, Lessors, in their sole discretion, deem said request to be reasonable and meet under the circumstances."

The $5,000 "consideration" which under the terms of the Jensen lease was payable on January 5, 1961 (time being expressly made of the essence), was not paid by Kenworthy on that date and was never paid. On some date, undisclosed, Jensen, according to Kenworthy's testimony, prevailed upon Kenworthy to give him a check dated March 23, 1961, for $5,000 so that if state officials should ask Jensen he could say that Kenworthy had given him such a check. The check, as both Jensen and Kenworthy knew, was drawn without funds in the bank to cover it and was not to be cashed. (Kenworthy, before or during trial, recovered the check from Jensen.)

During the trial, Kenworthy admitted that the proposed building site was subject to the cloud of a map-dedicated street which had never been built. There was no evidence that proceedings for the abandonment of the street were ever taken. On the contrary, Kenworthy testified: "The City told me, 'Once we acquire something, Mr. Kenworthy, we never give it up.' "

After Kenworthy's lease with the state had been signed, he took the plans and specifications to Los Angeles, where his architect, Welborn, was to prepare working drawings.

The working drawings were not submitted within 30 days as provided in the lease. This was not the fault of Kenworthy. The officials of the state recognized that fact. At least one substantial change, and perhaps other minor ones (the record is not clear), made in the plans, prevented preparation within the time limit. Two IBM rooms originally shown as adjoining at one end of the building were separated and placed at opposite ends. These changes, however, had been agreed to in December. Late in that month Lew Clingan, Chief of the Division of Buildings and Grounds, inquired of Kenworthy when the state could expect the working drawings. Kenworthy replied that the changes had prevented him from completing them. Clingan then stated he would advise the Bureau of Criminal Identification and Investigation that no further changes by them would be made without his personal approval. On January 6, 1961, a memo so advising the bureau was sent.

On January 12th, or thereabouts, Kenworthy submitted a set of working drawings. (These included the IBM room

changes referred to above agreed to in December.) These drawings were turned over to be checked by an architect, Raymond Shea, employed by the department.

As to what happened thereafter in January there is a conflict in the evidence[4] between Kenworthy and the officials of the state. On about January 16th, according to the state witnesses, a meeting was called and held between Kenworthy, Clingan, Elliot Adams (architectural head of the Building and Grounds Division), Shea, George Brereton (Deputy Director, Department of Justice—the Bureau of Criminal Identification and Investigation being one of the bureaus under his supervision through the chief of the bureau) and other personnel of the bureau. The purpose of the meeting was to determine whether any further changes should be made which Clingan would approve prior to the final approval of the working drawings, and the notice thereof which would start building construction time running. In the meantime the bureau had requested that several offices in the "Narcotics" and "Criminal Statistics" sections which, under the original plans, had been located along an interior wall, be "flipped" to the outside wall of the building. This involved the moving of door-height partitions. Mr. Clingan testified: "We discussed this change with Mr. Kenworthy as to what effect it would have on either his drawings, his time or his cost, and he indicated that there would be no problem and I at that meeting approved the relocation of the offices in question from the interior wall to the exterior wall."

Kenworthy was repeatedly asked whether he had had the conversation as described by Clingan. He repeatedly answered that, "To the best of my recollection, I had no conversation with any member of the State *on the 16th*." The question whether such a conversation had occurred on another day seems not to have been explored. It was admitted that the change was agreed to orally at some time.

Shea completed his check of Kenworthy's working draw-

---

[4]Since we review the evidence not only for purposes of determining its sufficiency to support the judgment but also to determine the prejudicial effect of misconduct it is our duty to consider conflicts to ascertain whether "a result more favorable to the appealing party would have been reached in the absence of the error." (*People* v. *Watson*, 46 Cal.2d 818, 836 [299 P.2d 243]; Cal. Const., art. VI, § 4½; *Aldabe* v. *Aldabe*, 209 Cal.App.2d 453, 457 [26 Cal.Rptr. 208].) In the application of the facts to the question of the sufficiency of the evidence it will be our duty to resolve conflicts in respondents' favor. (*Berniker* v. *Berniker*, 30 Cal.2d 439, 444 [182 P.2d 557].)

ings on January 16th. He had found a number of instances where the drawings were inaccurate or incomplete. He indicated these matters by orange-red crayon markings on the drawings, mostly on the floor plan. Several sets of the drawings were so marked. Illustrative of these markings were notations that dimensions had not been included on the drawings submitted, that the location of columns had not been shown, that as to certain matters detail drawings should be added, that the swing of doors had not been shown. A door not needed was omitted. The crayon marks indicated where the telephone panels should be placed and a notation was included, "Verify with telephone company number and location of telephone panel cabinets. Show the roof leaders." (These are drains in the roof.) No *changes* were made. All of the markings related to items called for by the original plans or specifications. In addition to the checking of the drawings and the corrections and notations described, Shea also prepared additional detail drawings which were submitted to Kenworthy's architect.

The working drawings as submitted January 12th did not, of course, show the "flip" of the office partitions. Kenworthy explained how that change affected the locating of telephone, electrical and air conditioning conduits. These locations had to be fixed before a concrete floor slab could be poured. (Ernest Chan, Kenworthy's electrical engineer, but a witness for the state by whom he is regularly employed, testified that the conduit changes caused by the relocation of office partitions would have been made on the electrical wiring plan by a draftsman in less than a half hour.)

Meetings took place between Kenworthy and several officers of the state on January 23d. The parties disagree as to what took place. Clingan testified that he asked Kenworthy: "When can we expect to see some evidence of construction?" and that Kenworthy had replied that he, Clingan, was "now in the position of holding up the progress on the work, that he could not proceed until I approved his working drawings." Clingan (according to his testimony) then told Kenworthy that the state was in a position to give this approval, and that he would do so. He testified that Kenworthy had then replied that that would be fine. Kenworthy denied that the conversation described ever took place. He did recall having brought his architect, Welborn, in to introduce him on that date but stated that he, Kenworthy, had left after the introduction.

Clingan instructed Adams to prepare a rough draft of a notice of approval. Adams did so, Clingan revised it, and it was signed by Clingan and mailed to Kenworthy on January 25th.

This notice states that Kenworthy's working drawings had been reviewed, that suggestions regarding corrections and deficiencies had been noted thereon, that these had been reviewed with Welborn who had been furnished with additional detailed data. The notice included the following: "This is to advise you that under the foregoing conditions the six months' period for construction and completion of the project will commence on January 25, 1961."

Kenworthy did remember a conversation with Clingan on January 25th, a conversation which Clingan denied. Kenworthy stated that he had seen that day for the first time the notations and corrections which Shea had made on the working drawings, and he was discussing these matters with Shea and Adams when Mr. Clingan walked into the room; that Clingan had said the Bureau of Criminal Identification and Investigation had had too much freedom and it had to be stopped and he said, "I am going to approve your plans because I am going to stop these changes that are being made." Kenworthy had replied, " 'How in hell are you going to approve my plans now when you have got changes that are being made today. You haven't approved my mechanical, you haven't approved my electrical, you haven't approved my structural.[5] I didn't have any of the detailing on my drawings. . . . He said that he would give me notice of approval then and he said he would dictate it and have it typed up. . . .'" Notwithstanding the foregoing, Kenworthy testified on cross-examination: "Q. Then on January 25, 1961, you had all the details of this building necessary to draw plans? A. I had all of the information that I needed as of January 25, 1961, except of course I didn't—I had to verify the telephone and I had to get the telephone people to lay out that telephone plan plus I had to have the electrical engineer make the necessary changes to coincide with the new sheets they had given me."

[5] Kenworthy also claimed that Clingan had said that the state would not need to check his structural plans because these would have to be checked by the city and approved before a building permit would be issued. Clingan denied this. (There was no provision in the agreement or on the plans and specifications requiring the state to check structural plans. Its witnesses testified that it was not its custom in leasing transactions to do so.)

After Kenworthy received the notice of approval, he made no oral or written protest to the giving of the notice. The plans with Shea's red markings and the additional sheets (details) received were sent to Welborn by Greyhound bus. Adams testified that the work called for by these notations could have been done in three or four days. Welborn returned a new set of working drawings on February 14th. In addition to showing the corrections noted by Shea, the new plans showed the change ("flip") of the office partitions.

Meanwhile all during the period from November 15th through January Kenworthy had done nothing toward financing the construction of the building. Asked why, he testified on direct examination:

"Q. Well, had you made any financial arrangements between the period from the 15th of November and the 25th of January, sir? A. I was relying on the conversations[6] I had had previous to the 10th of October. Q. So you made no new arrangements—is that right? A. That's correct." However, after his bid had been accepted Kenworthy never did go back to State Mortgage.

Sometime after the 14th of February 1961 he called on Mr. Corkrum of the United California Bank. Corkrum said he would get an RCA credit report on Kenworthy and he asked Kenworthy for a financial statement; also a copy of the signed lease and plans and specifications. Kenworthy applied for a permanent five-year loan of $400,000. Corkrum advised that a construction loan only would be considered and asked Kenworthy for a "take-out" commitment. Kenworthy then asked for a construction loan. Kenworthy was asked on cross-examination why he had not gone back to State Mortgage which, as noted, had indicated that it would consider making a permanent loan. He gave several incomplete explanations, then said that since he was then dealing with United California Bank he did not want to seem to be "shopping" for a loan.

On March 6, 1961, the telephone company submitted the telephone lay-out plan, conforming to the February 14th working drawings. The record does not disclose when this had been sought or why it had not been procured earlier. Suggestion had been made by the state architect in January that Kenworthy should get this.

On March 22d Kenworthy informed Mr. Ham, state leasing

---

[6]The conversations referred to were with Mr. Cloyd of State Mortgage.

agent, that either Wong, Bel Air Markets,[7] or a loan company would make a loan and that he, Kenworthy, would go ahead if it cost him 50 per cent of the deal. Previous to that, on a Monday, Kenworthy had assured Ham that a loan would be prepared by Friday, and that he would be able to tell them he was then breaking ground. Ham's notes stated that Kenworthy was doing a fine job on plans. But no loan was obtained and no "breaking ground occurred."

Sometime towards the end of March, Clingan and Kenworthy had a conversation with Corkrum of the United California Bank. At this conversation Clingan was asked if the state would waive the "penalty" clause of the contract or in lieu thereof grant an extension of time for completion to six months from March 30th. Clingan, in turn, asked Corkrum if he could assure Clingan that the bank would finance Kenworthy if such an extension were given. Corkrum stated he could not give such assurance, that he was simply trying to put together a "package" which he could present to the bank's loan committee. Clingan asked Kenworthy what his schedule of construction was, and Kenworthy replied that he did not have a schedule of construction at this time. Clingan then told Kenworthy that since they were still in the area of speculation, with nothing concrete, the state would not grant the extension requested. He did not, however, close the door to the granting of an extension in the event of a concrete loan commitment.

Kenworthy received a letter from Pacific Finance Company dated March 22, 1961, entitled, "Commitment to Lend." The letter set forth conditions upon which that firm would make a "take-out" loan of $400,000. The interest rate was to be 10 per cent per annum. Principal and interest were to be amortized at the rate of $10,000 per month until the expiration of the original 30 months' term of the state lease at which time the entire unpaid balance would become due. The following condition was included: "That before we are called upon to lend we have been furnished a take-out letter of commitment in form, and from a concern, satisfactory to us." The letter acknowledged receipt of a fee for the "commitment" which was to keep it alive until April 21, 1961. To keep the "commitment" open until November 24, 1961, an additional fee of $7,000 was demanded. A friend of Ken-

---

[7] There is no evidence that a loan was ever sought from either of these sources.

worthy's had, he testified, paid Pacific Finance $1,000 for the "commitment." (No commitment to "take out" the "take-out" was ever obtained by Kenworthy. The $7,000 fee was never paid.)

On March 30, 1961, Kenworthy wrote to Mr. Clingan. The letter, in evidence, called attention to the clause in Kenworthy's lease with the state whereby the date of completion was to be extended for the period equal to the time Kenworthy was delayed in construction by act of the state. It claimed the state had had an obligation to check Kenworthy's structural plans, that it had delegated that duty to the city building department as its agent, and that Kenworthy was therefore entitled to a period of six months from whatever date he might obtain this approval within which to construct the building. (But see fn. 5.) It was further stated in the letter that Kenworthy had "diligently" pursued the issuance of the building permit, that the city had suggested its issuance would be expedited by the hiring of a structural engineer to make a plan check, that necessary corrections had been made. Kenworthy, in his letter, asked the state's confirmation that he be allowed six months "from the date of issuance or the date of official approval of the said working drawings by the City of Sacramento." (No city approval of Kenworthy's plans was obtained until May. Kenworthy explained his delay: "Now, the reason I didn't pick up the building permit the first day it was ready was because I hadn't gotten confirmation from the City. (*sic*) I had no need for the building permit unless I could start the building.")

On or about March 31st the state learned of the impending foreclosure sales under Kenworthy's trust deeds.

On April 7th Clingan wrote Kenworthy that the questions raised by his March 30th letter were being considered and a meeting was suggested to discuss "the progress which you are making toward complying with your obligations under said lease." That meeting was held on about April 10th. At that time Clingan or Collins told Kenworthy they thought the state could give him an extension of time of an extra month. Kenworthy reiterated what he had stated before, that he could build in four months but had to have six months more to get financing. (According to Kenworthy he had, at that time, a broker trying all over California to get a loan.)

Assistant Director of Finance Collins testified regarding

the position of the state at this time. His testimony may be summed up as follows: He had made a tour of the premises then occupied by C.I. & I. and had observed the almost impossible working conditions. The urgency of the state to get a building at this time was described as "dire." The prospects of getting one built by Kenworthy were not encouraging. The only prospective lender, the United California Bank, had stated it could not guarantee the bank would make a loan. Collins testified: "We were concerned as to whether or not the lessor could actually construct the facilities. We did not want to give him an extension of time unless he could show some real indication that he was able and about to undertake construction and we wanted some definite proof of this before we just gave him an extension without knowing what was going to happen." He also testified: "[I]f there was some way that Mr. Kenworthy could produce a building, we were anxious to get it." Kenworthy was told this.

On April 18, 1961, Clingan made further answer to Kenworthy's March 30th letter. The letter commented particularly on Kenworthy's contention that he was entitled to six months starting from date of City of Sacramento approval of working drawings. In reply to this it is stated: "The State must assume that the securing of approval from the City of Sacramento was simply one of several matters which you, as a builder, must have taken into consideration in making the agreement to construct the building within the time limitation indicated." The last paragraph of the letter reaffirms the state's position that Kenworthy was obligated to complete the building within six months from January 25, 1961.

Kenworthy did not construct the building; the state did not officially terminate the lease. Collins testified that termination was considered but not effected.

The state did, however, in May enter into a lease with one Charles Brown who had been the second lowest bidder in October. A building was built by Brown under the new lease and the Bureau of Criminal Identification and Investigation moved in.

Those are the facts. The state argues that under them no cause of action pleaded by the complaint (nor any other) was proved. We are compelled so to hold. The complaint had pleaded (1) that the state had caused delays which entitled plaintiffs to six months from March 30, 1961, within which to build the building and (2) that Kenworthy but for said de-

lays would have been ready, willing and able to perform all of his obligations under the contract. Neither of these issues was proved. Kenworthy did produce evidence sufficient to establish—if believed by the jury and for the purposes of this phase of the case we must assume that the jury did believe it (see fn. 4)—that acts of the state had caused delays entitling Kenworthy to an extension of time beyond the six-months' period from January 25th (expiring July 25th) by several weeks. By no stretch of inferability, however, does the evidence permit a finding that Kenworthy was entitled to the extension demanded (six months after approval of the plan by the city building department) or to an extension of six months from March 30th. Working drawings sufficient for state approval had been furnished by February 14th, 20 days after the notice of approval given. If notice of approval had been given on February 14th, such notice, under the terms of the contract, would *clearly* have started the six months' period running. The fact that it was 20 days premature did not relieve Kenworthy from delays of his own making thereafter. After February 14th it was his responsibility, not the state's, to obtain a building permit. It was also Kenworthy's responsibility to ascertain where the telephone conduits would have to be run—if that were necessary before the floor slab was poured. Nothing would have prevented him, while awaiting that information from the telephone company, from moving his equipment onto the site or from grading and preparing it for construction—nothing, that is, except a lack of money. And we can find nothing that the state did to prevent Kenworthy from getting a loan. Although the state, through its implied covenant of fair play, was obligated not to impair Kenworthy's borrowing power, it was under no duty to extend his time to complete the building until September 30th and that was the condition demanded by the bank without which a loan would not even be submitted to its loan committee. The state had indicated to Kenworthy that it would extend his obligated completion date to August 25th upon proof of his ability to start construction. That was a greater extension than Kenworthy was entitled to.

The truth revealed by this record is that there was no showing whatever that Kenworthy *ever was* in a position to build the building. On the contrary there was substantial, uncontradicted evidence that he was dilatory in starting to obtain financing. It is the burden of a contractor-plaintiff who seeks damages on the grounds of a defendant's

prevention of performance of a contract, to prove that but for the defendant's acts he was ready, willing and able to perform. (*Big Boy D Corp., Ltd.* v. *Etheridge, supra,* 44 Cal.App.2d 114, 117.) Here, Kenworthy *pleaded* he was ready, willing and able but did not sustain the burden of *proving* it. Insolvent when he obtained the lease from the state, he never did have a binding commitment from any lending agency for either a construction loan or a "take-out" loan. The letter from State Mortgage Company was not such a commitment, even for the insufficient amount ($300,000) which, it had said, was under consideration. United California Bank had given nothing but an expression of willingness to bring a construction loan before its loan committee (1) if a favorable RCA report and financial statement were received; (2) *if* an extension of time to build beyond any obligation of the state to give an extension were promised and (3) if a "take-out" loan commitment were obtained. There was no showing a favorable RCA report was received or a satisfactory financial report given. Since Kenworthy was obviously insolvent neither could have been received nor given.. The extension was not obtained. No binding "take-out" commitment was obtained. The letter from Pacific Finance was predicated upon several unfulfilled conditions precedent which were never met and which quite apparently could *never* have been met, including the requirement of a "take out" of the "take out."

Nor was there a showing that the ground lease from Jensen to Kenworthy was enforceable against the former. Its recited consideration of $5,000 had never been paid and was overdue. Kenworthy had had no ability to pay it within the time limit (time being of the essence), or thereafter. Perhaps Jensen would have waived the default, but Jensen was not produced as a witness and a waiver was not proved. It was Kenworthy's burden to prove he had a *binding* lease.

Use of the leased land as a site for the building to be constructed required abandonment of a dedicated (but nonexistent) street. There was no proof this abandonment had been obtained or even sought. The evidence, as we have seen, was to the contrary, that the city had indicated it would *not* abandon the street. Other provisions of the lease noted above made the status of Kenworthy's leasehold rights extremely tenuous.

We hold there was no default by the state which prevented

Kenworthy's performance of the contract, no proof of the latter's ability to perform. This requires reversal with directions.

This leaves unnecessary to decision any determination of the question of the misconduct of counsel. We are impelled to discuss it, however, because we find in the record gross and deliberate misconduct and because, in spite of the frequency with which appellate courts recently have had to deal with, denounce and reverse for counsel's misconduct (see the cases hereinafter cited), the message still seems not to get through to some trial attorneys.

The issues presented by the pleadings (which we have outlined in detail above) were clear enough. They were not, however, the issues upon the basis of which Kenworthy's counsel, Mr. Kaiser, sought to present plaintiffs' case to the jury. He sought to persuade them (1) that Charles Brown, the second lowest bidder and ultimate builder of the building for the state had an "inside track" with the state, induced by a bribe offered to, and accepted by, a state official, (2) that a number of state officials in fraudulent conspiracy with certain city officials had prevented Kenworthy from constructing the building, and (3) that certain unnamed state officials had tried to induce Kenworthy to pay them a bribe which he had been unwilling to pay. Not a word of any evidence, written or oral, supported these charges. They were, however, firmly implanted in the jury's minds by counsel's statements.

The state has specified many instances of misconduct. The same specifications were urged as grounds for the state's motion for a new trial. The latter included charges against plaintiffs' counsel made during the *voir dire* examination of jurors. These we cannot appraise here since that portion of the transcript is not before us.

A specification of misconduct we can appraise is an incident occurring when Lew Clingan, Chief of the Division of Buildings and Grounds, was called as a witness by plaintiffs under Code of Civil Procedure section 2055, as part of their case in chief. After establishing Clingan's identity, and without further questioning, plaintiffs' counsel, Mr. Kaiser, stated to the court: "Your Honor, at this time I wish to offer a certified copy of a complaint entitled: G. Keith Kenworthy versus, among others, Lew Clingan, for fraudulent conspiracy to induce a breach of a contract." When asked the purpose of the offer, counsel stated it was being offered for

purposes of "impeachment." The court observed: "You haven't asked a question. How can you impeach him before you ask a question?" The objection was sustained.

Offer in the presence of the jury of the complaint, a self-serving document, and the statement made by counsel which accompanied it, were patently improper. In fact, plaintiff does not *here* contend otherwise. The pleading sought to be put before the jury was a complaint which had been filed in Sacramento *less than two weeks before the commencement of the trial in this action.* Charles Brown, Arthur Collins, Lew Clingan, Robert L. Harkness, Director of General Services of the state, Bartley Cavanaugh, Sacramento City Manager, John Shelby and Otto Steinbrenner, officials and employees of the city, were named as defendants. The complaint alleged a fraudulent conspiracy to induce the State to breach its contract with Kenworthy. We think that judicial notice can be taken that the filing of such a complaint against prominent officials of the state and city must have occasioned wide newspaper publicity in the Sacramento area. (Witkin, Cal. Evidence (1958) § 50, p. 65, and authorities cited.) The timing of the filing of this complaint with reference to the date of the commencement of this jury trial to us has significance. (See *Cote* v. *Rogers* (1962) 201 Cal.App.2d 138 [19 Cal.Rptr. 767].)

The next incident of alleged misconduct is this: During the cross-examination of Arthur Collins, plaintiffs' counsel asked Collins, and the latter affirmed that Collins had purchased shares in a corporation known as Northern California Developers. Collins stated he had bought the shares for $5,000. Asked if Charles Brown was not then a member of the board of directors of said corporation, Collins stated that he was not. Counsel then, *in the presence of the jury,* made a formal offer of proof that at the time of the purchase of the shares by Collins, Brown had been a director of the corporation. He stated he would, during the noon hour, get proof of this from the office of the State Corporation Commissioner. Such evidence was never produced. Nevertheless, other questions were put carrying the implication that Brown, a director of the corporation, had given preferential treatment to Collins in the purchase of shares in return for favors from the state in obtaining a lease. No proof whatever of this was offered. Kaiser admitted he had no such proof. At one point the court inquired: "Mr. Kaiser, is it your position that Mr. Collins did anything other than pay the quoted price for the

stock for this corporation?'' Mr. Kaiser, plaintiffs' counsel, answered: ''I don't know.''

There was other misconduct of the same tenor. A gratuitous assertion was made by Kaiser in the presence of the jury that he would prove that Brown when he dealt with the state was insolvent. No such proof was offered or made. (See *People* ex rel. *Dept. of Public Works* v. *Lillard,* 219 Cal. App.2d 368, 379 [33 Cal.Rptr. 189].) Kaiser's arguments to the jury were replete with insinuations, none of which had any support in the record. It was suggested that even before the Kenworthy lease the calls for bids had been rigged to help Brown. It was stated that ''Clingan and Collins never intended that Kenworthy be able to perform this contract;'' it was implied, however, that Kenworthy could have bought state approval by tendering some unnamed state official 25 per cent of the deal.[8] This brought an objection by the Attorney General and the court's remonstrance: ''The Court: There is no evidence of any solicitation of bribery or anything of that type. Mr. Kaiser, I hardly know just what to say to you.'' Mr. Kaiser replied: ''I don't say there is any evidence, too, but I can't understand the 25.''

We have made a careful analysis of a long (five volume) record. The foregoing instances of misconduct are merely samples. For example, in argument the state was also accused of suppressing evidence, to wit, certain plans. There was no proof of this whatever. In our opinion, the design and purpose of plaintiffs were clear. There was a deliberate attempt to administer poison, no single dose of which was lethal but with an accumulative effect inevitable and realized. The most recent decision of our Supreme Court discussing misconduct of counsel is *Garden Grove School District of Orange County* v. *Hendler,* 63 Cal.2d 141 [45 Cal.Rptr. 313, 403 P.2d 721]. In that case, where the misconduct was quite similar to that practiced here (and certainly no more flagrant) the court (per Justice McComb) stated (on p. 144): ''The question is not whether the award is a reasonable one, but whether it is reasonable to conclude that a verdict more favorable to

---

[8]The Attorney General in his opening statement had referred to Kenworthy's inability to get a loan since he had nothing to offer a lender as security except his lease. During the course of this statement he said ''He wasn't offering any part of the deal; he didn't give up 25 per cent, for instance, of his lease as security. He merely wanted to give the rent under the lease as security.'' It was this statement which Kaiser attempted to twist by insinuation into the statement described above.

defendants would have been reached but for the error. (Cal. Const., art. VI, § 4½.)''

The trial judge, in denying the state's motion for a new trial, stated that he did not regard the size of the verdict ($219,000), as an indication that Kaiser's misconduct had influenced the jury. We find it impossible to agree with this conclusion.

Kenworthy in his testimony had expressed no opinion as to what his net profits would have been nor did he show himself qualified to do so since he had neither training nor experience in the field in which he had contracted. (*Randles* v. *Nickum & Kelly Sand & Gravel Co.* (1942) 169 Ore. 284 [127 P.2d 347, 349].) He produced no expert who testified as to what Kenworthy's profit would have been. Nor did he produce a witness to explain the proper factors to be considered in the determination of profit under a lease of this kind.

It would seem beyond question that the general or ordinary experience of a layman would be insufficient to make such determination and therefore this was a field in which expertise is indispensable. (2 Wigmore on Evidence (3d ed.) p. 640, § 559.) Without any evidence to sustain him, Kenworthy's attorney during argument adopted a method of computation of his own and urged the jury to find loss of prospective net profits in the sum of $219,000. The formula upon which counsel based this figure was this:

| | | |
|---|---|---|
| Gross receipts | | $480,000 |
| *Deductions* | | |
| Ground rent | $ 39,000 | |
| Services & Utilities at $4,500 per month | 135,000 | |
| Interest on loans | 87,000 | |
| Total deductions | $261,000 | 261,000 |
| Net profit | | $219,000 |

As stated above, no evidence supported this method. No figure was included for taxes (which under both the Jensen lease and the lease with the state Kenworthy was obligated to pay); nothing was deducted for depreciation. Cost of the amortization of loans was not considered. In computing interest on loans, Kenworthy's counsel assumed a construction loan at 6½% per cent and a ''take-out'' loan at 10 per cent on a diminishing principal over 30 months. Assuming (contrary to the fact) that there was evidence to support an assumption

that a construction loan from the United California Bank and a ''take-out'' loan from Pacific Finance Company would have been available to Kenworthy at 6½ per cent and 10 per cent respectively, counsel disregarded the additional $8,000 Kenworthy would have had to pay Pacific Finance Company under the terms of its letter.

The jury was not without competent testimony on this subject. The state called a witness who did qualify as an expert, Senior Land Agent Miller. He testified that in estimating probable net profits from a lease of the type involved, taxes, costs of amortization and depreciation are all expenses which must be deducted. Miller gave his opinion that when all proper factors were considered Kenworthy would have had a loss, not a profit. The jury did not have to accept Miller's opinion but it did have to accept as fact the method of computing probable profit or loss since no other method was before it. (*Estate of Kuttler* (1958) 160 Cal.App.2d 332, 337 [325 P.2d 624].) Therefore we must conclude that the jury did not weigh and reject the state's evidence on the question of damages. It simply disregarded it.

Two recent decisions, one of the Supreme Court, one of this court, discuss rather exhaustively the rules which determine when misconduct of counsel is, and is not, prejudicial. In *Horn* v. *Atchison, T. & S. F. Ry. Co.* (1964) 61 Cal.2d 602 [39 Cal.Rptr. 721, 394 P.2d 561], misconduct was found to exist calculated to create an atmosphere of bias and prejudice, depriving defendant of a fair trial, but it was held that defendant had waived its right to complain where objections to the misconduct had not been seasonably made. The court stated that objections would have given the court the opportunity to admonish the jury and thus remove the prejudicial effect of misconduct. In *Love* v. *Wolf*, 226 Cal.App.2d 378 [38 Cal.Rptr. 183], we held that where intentional, blatant, and continuous misconduct by plaintiff's counsel *had been* met by timely objection and demands for a mistrial and admonitions by the court had not been consistent, the misconduct constituted reversible error; this notwithstanding the reluctance of reviewing courts to reverse for conduct merely moderately captious.

The misconduct in the case at bench described above *was* in almost every instance noted and promptly objected to and therefore the waiver found in *Horn* does not exist. On the other hand, the trial court in nearly every instance repri-

manded the attorney and admonished the jury. The court in denying defendant's motion for a new trial felt that its admonitions had been an antidote sufficient to counteract the venom. The judge saw and heard the actors; we merely read the transcript. But the grossly excessive verdict (which the judge reduced by $95,000) as we have shown argues forcefully a verdict tainted by bias and resulting from prejudice.

The question of the state's right to recover on its cross-complaint remains. Less than a page of appellant's opening brief (none in its closing brief) is devoted to argument on the question of the state's right to recover under its cross-complaint. No authorities are cited; no evidence in the record supporting its position is recited. It is simply stated: "Appellant was delayed in obtaining the office space in the substitute building. The cross-complaint . . . based upon the liquidated damages provision of the lease . . . was supported by the evidence and should have resulted in a verdict and judgment in favor of appellant."

It is not the duty of a reviewing court to search the record to find material supporting an appeal, or some specific ground therefor, thus effectively assuming the role of appellant's advocate. (*Leming* v. *Oilfields Trucking Co.*, 44 Cal.2d 343 [282 P.2d 23, 51 A.L.R.2d 107]; *Tesseyman* v. *Fisher*, 113 Cal.App.2d 404 [248 P.2d 471].) The facts reviewed above and the conclusions reached negating Kenworthy's right to recover against the state do not automatically establish the state's right to a judgment on its cross-complaint. Although there was no *formal* termination of the contract by the state after it became obvious that Kenworthy could not perform, there was substantial evidence that there had been a termination *by its acts* and this termination may have been under circumstances imputing a waiver of the state's right to recover damages. As to the question of damages, we have been referred to no evidence which would have compelled the jury to find actual damages and no proof which would have justified the trial court or jury in applying the "liquidated" damage provision of the contract. (1 Witkin, Summary of Cal. Law (1960) p. 189.)

Judgment in favor of plaintiffs and against defendant on plaintiffs' complaint is reversed with directions to the trial court to enter judgment thereon in favor of defendant with costs. Judgment in favor of cross-defendants and against

cross-complainant on the cross-complaint is affirmed. Defendant State of California shall recover its costs on appeal.

Friedman, J., and Regan, J., concurred.

A petition for a rehearing was denied August 26, 1965, and respondents' petition for a hearing by the Supreme Court was denied September 29, 1965. Mosk, J., did not participate therein.