[Civ. No. 35754. First Dist., Div. One. Mar. 22, 1976.]

VERA B. NEUMANN, Plaintiff and Respondent, v.
MARY JANE BISHOP, Defendant and Appellant.

## COUNSEL

Nagle, Vale, McDowall & Cotter and Bernard T. Cotter for Defendant and Appellant.

Popelka, Allard, McCowan, Cabrinha & Jones, Bernard J. Allard and Michael J. Murray for Plaintiff and Respondent.

## OPINION

**SIMS, J.**—Defendant has appealed from a judgment which became final after plaintiff, in conformance with the trial court's order on defendant's motion for new trial, accepted a reduction to $280,000 from a jury verdict which awarded her $362,389.75 damages for injuries suffered as a result of an automobile collision. Defendant contends: (1) that the trial court erred in three particulars in the rulings on the admission of evidence; (2) that error was committed in instructing the jury; (3) that there was rampant misconduct of plaintiff's counsel which deprived the defendant of a fair trial; and (4) that the amount of the judgment, as reduced, is excessive. Although counsel's conduct cannot be condoned, there is no merit to defendant's other claims of error; and, on our review of the entire record, it does not appear as a matter of law that any prejudice that might have been occasioned by that conduct was not cured by the action taken by the trial court in reducing the verdict. The judgment must be affirmed.

## I

On December 24, 1972, plaintiff was traveling south on Old Bayshore Highway. She testified she was going at a speed of 25 miles per hour. Defendant was driving east on Bayswater toward its intersection with the old highway. Bayswater ends at the old highway, forming a T-intersection, which is controlled by a stop sign and limit line on Bayswater. Defendant either stopped or hesitated at that point and then proceeded to turn into the old highway to travel in a northerly direction and collided practically head-on with the plaintiff's vehicle in the southbound lane.

## A

A police officer of 20 years experience, who arrived at the scene shortly after the accident, testified that parked vehicles, a tree, and the fact it was raining would have obscured the defendant's vision to the north to some degree. The cars were parked along the west side of the old highway north of the intersection. He testified that at the time of the accident there was a clearly marked red zone on the west side of the old highway south of the intersection, but that he had no idea if there was any red zone on the north side. On cross-examination he was asked if he recalled that the northerly curb was painted red and in a faded condition on the day of the accident. Plaintiff's objection was apparently sustained after an unreported discussion at the bench.

■ It was defendant's theory below, reiterated on appeal, that she should have been able to show that the cars were illegally parked upon the old highway, and that in some way that fact would justify or excuse any failure on her part to perform the statutory duties governing the conduct of a driver under the conditions in which she proceeded into the intersection. (See *Satterlee* v. *Orange Glenn School Dist.* (1947) 29 Cal.2d 581, 592 [177 P.2d 279] [overruled in *Alarid* v. *Vanier* (1958) 50 Cal.2d 617, 622, 624 (327 P.2d 897)]; Evid. Code, § 669, subd. (b); BAJI Instruction No. 3.45; and 4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, §§ 540-541, pp. 2807-2809.) In this case the passive condition created by the parked cars was not an active factor in defendant proceeding at a time and in a manner which was not reasonably prudent. In *Martin* v. *Nelson* (1947) 82 Cal.App.2d, 733 [187 P.2d 78], upon which defendant relies, the court, on appropriate facts, observed, "When the violation [driving on the wrong side of the road] is caused by some

independent force over which the violator had no control the violation is excused. [Citation.]" (82 Cal.App.2d 733, 735.) If the cars were in fact illegally parked it would not excuse the defendant from exercising due care, but at best would only establish concurrent negligence of the defendant and the person who illegally obstructed the normal visibility. (See *Rosa* v. *Pacific Gas & Elec. Co.* (1955) 133 Cal.App.2d 672, 674 [284 P.2d 844], and Peters, P. J., dissenting at p. 677.)

In considering plaintiff's contention the following is pertinent, "Initially, it must be observed that a motorist proceeding along a through street or highway protected by stop signs has the right-of-way at intersections over motorists on intersecting thoroughfares, even as against vehicles approaching from the right. The motorist on the through highway may assume that the driver of a car on the intersecting highway will observe the law. If the law requires the motorist on the intersecting highway to stop, the driver on the through highway may assume that he will stop and yield the right-of-way as the law requires. [Citations.]" (*Bristow* v. *Brinson* (1963) 212 Cal.App.2d 168, 173 [27 Cal.Rptr. 796]; Veh. Code, § 21802; and BAJI Instruction No. 5.12.) Any obstruction to the view of the driver on the through highway does not affect his right to make that assumption. (*Bristow* v. *Brinson, supra,* 212 Cal.App.2d at pp. 173-174.) ■ It would appear, however, that the obstruction of the view of the entering driver is merely one of the circumstances to be considered in determining whether a reasonably prudent person in the position of that driver, having made the required stop, would realize that another vehicle approaching the intersection would probably collide with his vehicle if he then proceeded to enter or cross the intersection. (See *Potapoff* v. *Mattes* (1933) 130 Cal.App. 421, 423 [19 P.2d 1016].) The cause of the obstruction is immaterial insofar as the duty of care imposed on the entering driver is concerned.

■ There was no error in sustaining the objection to the question designed to ascertain whether the parked cars which obstructed the view were parked in violation of law.

## B

Plaintiff asked the officer who investigated the accident, "And was there any evidence of excessive speed on behalf of [plaintiff]? " The court originally sustained the defendant's objection for lack of foundation. After the officer testified concerning his qualifications, the question was rephrased, and a further objection was overruled by the judge who

observed, "The only question is if he saw any evidence of excessive speed and I will let him answer the question." The officer answered, "No, there wasn't." The officer had previously testified that the posted speed limit on the old highway was 35 miles per hour. On cross-examination the witness testified that he had traveled southbound on the old highway on occasions and that he had never noticed that there was a sign on the west side of the street north of the scene of the accident posted for 25 miles per hour,[1] and he reiterated that it was posted for 35. He acknowledged that he had no idea of how fast the plaintiff was going at the time of the accident, but it was his impression, and he would say, she was not exceeding 35 miles per hour. He explained, "There was no physical evidence to give me any indication of what speed she was going, there was no skidmarks, no markings on the pavement, I wouldn't really have any idea"; and he added that because of the amount of physical damage he observed, he doubted that the plaintiff was going in excess of 35 miles per hour, though it was possible she could have been going at that speed.

Defendant acknowledges, as set forth in *Hart* v. *Wielt* (1970) 4 Cal.App.3d 224 [84 Cal.Rptr. 220], "It is generally established that traffic officers whose duties include investigations of automobile accidents are qualified experts and may properly testify concerning their opinions as to the various factors involved in such accidents, based upon their own observations. [Citations.]" (4 Cal.App.3d at p. 229. See also *Davis* v. *Ward* (1963) 219 Cal.App.2d 144, 148 [32 Cal.Rptr. 796]; Evid. Code, § 801; and Witkin, Cal. Evidence (2d ed. 1966) § 418, p. 378.) She also recognizes that "the responsibility for determining the competency and qualifications of an expert witness rests initially with the trial court. [Citations.] And on appeal, the lower court's ruling will not be disturbed unless there has been an abuse of discretion." (*Crooks* v. *Pirrone* (1964) 228 Cal.App.2d 549, 553 [39 Cal.Rptr. 622]. See also *Hart* v. *Wielt, supra,* 4 Cal.App.3d at p. 229; and *Davis* v. *Ward, supra,* 219 Cal.App.2d at p. 148.) ■ She contends that the testimony that the officer saw no evidence of excessive speed gave a police stamp of approval to plaintiff's conduct and told the jury there was no evidence of wrongdoing on

---

[1] The plaintiff testified that in her opinion the speed limit on the old highway was 35 miles per hour. The assistant traffic engineer for the City of San Mateo testified that the speed limit in that city, which was posted north of the accident scene at the time of the accident, was 25 miles per hour. The defendant testified that her impression was that the plaintiff's car was going at least 30 miles per hour at the time she first saw it. The court instructed the jury that the prima facie speed limit at the scene of the accident was 25 miles per hour.

plaintiff's part, and that there was no ascertainable standard by which the opinion could be measured.

A review of the officer's testimony reflects that none of defendant's objections are tenable. The jury was instructed on the issue of contributory negligence, and that the prima facie speed limit was 25 miles per hour (see fn. 1 above). The officer's testimony of what he observed or failed to observe was only one circumstance to be considered in determining the issue of contributory negligence. No error is found in permitting the question and answer now referred to by defendant.

## C

Plaintiff produced an economist to testify concerning her accrued and prospective loss of earnings. The witness testified concerning his qualifications, the data he gathered concerning the plaintiff's employment history, and the truism that at $600 per month she would lose $7,200 per year. Plaintiff's attorney commenced what appears to be a hypothetical question. The defendant objected to any testimony from the witness on the basis that it would be of a speculative nature and the objection was overruled. The witness apparently made his computations on the basis that the plaintiff would have enjoyed continuous employment with her most recent employer. That assumption was buttressed by prior testimony from a representative of that employer. He also testified concerning the pension and Christmas benefits the employees received, and the salary paid to the employee who replaced the plaintiff. The witness testified to an accrued wage loss of $11,900. Defendant objected to a question concerning future wage loss on the ground it was speculative, and the objection was overruled. In the course of arguing, that objection, defendant conceded, "I agree that the doctor is qualified, but my objection goes toward the speculative nature of the testimony that counsel is trying to elicit." The witness then took the present rate of pay for the position that had been held by the plaintiff, and after advising the jury that the rate of inflation, leading to higher pay in the future, would cancel the discount that should be allowed for a present recovery of future earnings, computed a loss of future earnings to age 65 of $69,600, making a total earning loss of $81,500. The last statement was elicited over defendant's objection that there was no evidence to establish that plaintiff (who was 56 at the time of the accident and approaching 58 at the time of the trial) would be unable to work until age 65.

The witness was then asked, upon the basis of medical evidence before the court, his opinion as to her employability at age 60 if she underwent further surgery and further recuperation so that she would be physically able to work at that time. The defendant's objections that the question was speculative were again overruled. The witness concluded that it would be extremely difficult for the plaintiff to find employment at that age; that although he could not say it was impossible, he would say that the older you are the more difficult it is to get a job. Subsequently, objection was made and overruled to the introduction in evidence of the economist's diagram of his computations.

The jury properly was instructed in the language of BAJI Instruction No. 14.00 (compensatory damages, prior to its 1975 revision for comparative negligence), No. 14.11 (loss of earnings to date of trial), No. 14.12 (loss of earning capacity), No. 14.60 (speculative damages), No. 14.69 (giving the plaintiff's life expectancy of 22.6 years), and No. 14.70 (present cash value). It was also given a table for computing present cash value. Plaintiff was entitled to recover damages for all detriment certain to result in the future. (Civ. Code, §§ 3281, 3282 and 3283. See 4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 847, p. 3141.) ■ "Loss of earning power is an element of general damages which can be inferred from the nature of the injury, without proof of actual earnings or income either before or after the injury, and damages in this respect are awarded for the loss of ability thereafter to earn money. [Citations.]" (*Connolly* v. *Pre-Mixed Concrete Co.* (1957) 49 Cal.2d 483, 489 [319 P.2d 343]; *Zibbell* v. *Southern Pacific Co.* (1911) 160 Cal. 237, 248-249 [116 P. 513]; *Robison* v. *Atchison, Topeka & S. F. Ry. Co.* (1962) 211 Cal.App.2d 280, 286-288 [27 Cal.Rptr. 260]; *Lang* v. *Barry* (1945) 71 Cal.App.2d 121, 126-127 [161 P.2d 949]; *Ostertag* v. *Bethlehem etc. Corp.* (1944) 65 Cal.App.2d 795, 803-808 [151 P.2d 647]; and 4 Witkin, *op.cit.,* Torts, § 884, p. 3170.)

■ "The rule is that under the plea of general damages and to prove a loss of earning capacity, it is permissible to show what wages, salary, or emoluments, would be open to the plaintiff in a business, vocation, trade, or profession which he understands, and which he would have the right and ability to follow were it not for his incapacitating injuries. In this view the evidence was pertinent and permissible. It bore directly upon an occupation for the pursuit of which plaintiff had shown himself fitted and qualified and which he was following; and the rule as we have stated it is not at all in conflict with the other rule which forbids testimony of mere hopes or mere prospects of advancement, . . ." (*Zibbell* v. *Southern*

*Pacific Co., supra,* 160 Cal. 237, 249.) In *Ostertag* v. *Bethlehem etc. Corp., supra,* 65 Cal.App.2d 795, after reviewing cases dealing with the question of whether prospective damages were certain to occur, the court concluded, "The rule to be drawn from the foregoing cases is that from expert testimony as to the medical probabilities it is for the jury to determine whether future detriment is reasonably certain to occur in the particular case." (65 Cal.App.2d at p. 807.) The court noted that the jury could consider the victim's potential for employment in the future, despite an ability to secure some work at the time of trial. (*Id.,* and see *Robison* v. *Atchison, Topeka & S. F. Ry. Co., supra,* 211 Cal.App.2d 280, 286-288.) In the last cited case, the court observed, "In view of the plaintiff's age and the evidence as to the discomfort involved in the performance of his duties and as to his impaired agility, the trier of fact could properly find that he was reasonably certain to suffer a loss of future earnings because of inability to work for as long a period of time in the future as he could have done had he not sustained the accident." (211 Cal.App.2d at pp. 287-288.)

██ The testimony of the expert witness was not speculative in the sense that he called upon his expertise to make mathematical computations or express an opinion as to future economic conditions. Nor was it speculative in the sense that it was not predicated upon hypotheses that were not warranted by the evidence. The employer testified concerning the plaintiff's earning capacity, and the doctor testified concerning her then present condition of health and the need for further remedial surgery. The jurors as well as the economist could note the difficulty of securing reemployment at a more advanced age. There was nothing offered which offended the provisions governing the admission of expert testimony found in the Evidence Code. (Evid. Code, §§ 801-805.) Defendant has not questioned the qualifications of the expert. In fact she conceded he was a qualified economist. There was no abuse of discretion in ruling he was qualified. (See *Naples Restaurant, Inc.* v. *Coberly Ford* (1968) 259 Cal.App.2d 881, 883 [66 Cal.Rptr. 835]; and Witkin, Cal. Evidence (2d ed. 1966) §§ 411 and 1174-1175, pp. 370 and 1087-1088.) It was for the jury to determine whether his opinions were based on reliable information. (Evid. Code, §§ 801 and 802; and see Witkin, *op. cit.,* §§ 409-410, pp. 367-370.) It has been recognized that it is proper to receive the testimony of an actuary and actuarial charts in computing lost future earnings. (See *Emery* v. *Southern Cal. Gas Co.* (1946) 72 Cal.App.2d 821, 824-826 [165 P.2d 695]; *Groat* v. *Walkup Drayage etc. Co.* (1936) 14 Cal.App.2d 350, 359 [58 P.2d 200]; and Annotations (1961) 79 A.L.R.2d 259, and 275.) Here the questions of whether or not the

plaintiff would have enjoyed continuous employment until age 65 but for the accident, and whether or not other employment would be available for her when she recovered her health despite her age, were questions of fact for the jury's decision. (See *Groat* v. *Walkup Drayage etc. Co., supra,* 14 Cal.App.2d at pp. 358-359.) Any economic data bearing upon the determination of the probabilities was relevant and proper. (See *Krohmer* v. *Dahl* (1965) 145 Mont. 491, 495 [402 P.2d 979, 981-982]; and O'Connor & Miller, *The Economist-Statistician: A Source of Expert Guidance in Determining Damages* (1972) 48 Notre Dame Law. 354, *passim.*)

No error is found in the court's rulings admitting the foregoing evidence.

## II

Defendant cites four errors in instructing the jury, and claims that the dominant vice was a lack of completeness.

### A

■ In the course of its introductory instructions, sandwiched in between advice that the masculine form of pronoun as used in the instructions includes the feminine and neuter (BAJI No. 1.10) and an explanation of direct and circumstantial evidence and inferences (*id.,* No. 2.00), the court stated, "The words 'subject to liability', as used in these instructions, mean that in the absence of certain exceptions or defenses as to which you will be instructed, a defendant is liable for another's injury proximately caused by such defendant's conduct." (BAJI No. 1.11.)

Defendant points out that the phrase "subject to liability" is not found elsewhere in the instructions. Plaintiff has not indicated any other portion of the instructions to which the phrase would refer, and we must assume the instruction was redundant. Defendant claims the instruction was prejudicial because since the first part was never tied up with other instructions, it left the jury with the impression that the defendant was liable for any injury to the plaintiff proximately caused by her conduct, irrespective of whether the defendant was negligent, and regardless of any negligence on the plaintiff's part.

This argument overlooks the qualifying language "in the absence of certain exceptions and defenses" contained in the instruction itself, and also the specific instructions concerning the issues of the case, the burden of proof with respect thereto, and the specific standards of care applicable to each of the parties. The instruction may emphasize proximate cause in derogation of other factors giving rise to liability (cf. *Pepper* v. *Underwood* (1975) 48 Cal.App.3d 698, 711 [122 Cal.Rptr. 343]), but we cannot say it misled the jury. "It must be remembered that the trial court is not required to state all the law applicable to a case in one instruction. All of the instructions must be read as a whole, that is, each instruction should be considered in connection with all of the other instructions, and if the charge harmonizes as a whole, and fairly and accurately states the law, a reversal may not be had because of verbal inaccuracies, or because isolated phrases or sentences are open to just criticism. Since the charge must be considered as a whole, an error in an instruction is cured, if, when the whole charge is taken together, the law is accurately stated." (*Callett* v. *Alioto* (1930) 210 Cal. 65, 70 [290 P. 438]. Accord: *Bogner* v. *Eubanks* (1955) 137 Cal.App.2d 181, 184-187 [289 P.2d 875]; and *Perbost* v. *San Marino Hall-School* (1948) 88 Cal.App.2d 796, 801 [199 P.2d 701].)

B

An instruction was given in the language of section 21801 of the Vehicle Code.[2] No instruction was given in the language of section 22450 which sets forth the stop requirements as follows: "The driver of any vehicle approaching a stop sign at the entrance to, or within, an intersection, or railroad grade crossing shall stop at a limit line, if marked, otherwise before entering the crosswalk on the near side of the intersection. [¶] If there is no limit line or crosswalk, the driver shall stop at the entrance to the intersecting roadway or railroad grade crossing."

Defendant suggests that the jury were left to speculate concerning the requirements of section 22450 and may have imposed an improper

---

[2]This instruction read: "The driver of any vehicle approaching a stop sign at the entrance to, or within an intersection shall stop as required by Section 22450 and shall then yield the right of way to other vehicles which have approached or are approaching so closely from another roadway as to constitute an immediate hazard and shall continue to yield the right of way to such approaching vehicles until such time as he can proceed with reasonable safety."

The court also explained "right of way" and its qualifications in the language of BAJI Instruction No. 5.10, and "immediate hazard" as defined in Instruction No. 5.12.

standard of care on her. The evidence showed that there was a marked limit line on Bayswater. Although the evidence was conflicting as to whether she stopped or hesitated at the limit line, no issue was raised as to defendant's acts or omissions in approaching the intersection. The principal conduct complained of related to the manner in which she entered the intersection. Under these circumstances the giving of instructions embodying the terms of section 22450 might have been redundant, and, in any event, the omission would appear to have been favorable to defendant. (See *Chadwick* v. *Condit* (1962) 205 Cal.App.2d 313, 318-320 [23 Cal.Rptr. 245].) Copies of the proposed instructions were undoubtedly served on defendant. (See Code Civ. Proc., § 607a; and Cal. Rules of Court, rule 229.) ■ She cannot complain now that the instructions were incomplete if she offered no instruction to supplement or explain an instruction which was not erroneous on its face. (*Bailey* v. *Simpson* (1963) 215 Cal.App.2d 532, 538 [30 Cal.Rptr. 701].)

### C

The court also instructed the jury in the language of Vehicle Code section 22107, as follows: "No person shall turn a vehicle from a direct course or move right or left upon a roadway until such movement can be made with reasonable safety and then only after the giving of an appropriate signal in the manner provided in this chapter in the event any other vehicle may be affected by the movement." This instruction was qualified by BAJI Instruction No. 5.20 (turning a vehicle), and an instruction on left turns which embodied the requirements found in subdivision (b) of section 22100.

Defendant complains that the instruction was incomplete because it did not define the manner in which an appropriate signal should be given. Here again there was no issue as to the manner of signaling. (Cf. Veh. Code, §§ 22108, 21110 and 21111.) The only issue concerning the turning arose because it was contended that the defendant entered the intersection and attempted to make a left turn in an improper manner. No prejudice is demonstrated from the alleged omission.

### D

Following the foregoing instructions involving alleged violations of sections 21801, 22107 and 22100 of the Vehicle Code, the court at the request of the defendant gave a correct instruction on the prima facie

speed law, 25 miles per hour where the accident occurred, and the effect of a violation of the basic speed law, all as recommended in BAJI Instruction No. 5.31.

The court followed this with an instruction reading, "If you find that a party to this action violated any of the statutes just read to you, you will find that such violation was negligence unless you find by a preponderance of the evidence that she did what might reasonably be expected of a person of ordinary prudence, acting under similar circumstances, who desired to comply with the law." (See *Alarid* v. *Vanier* (1958) 50 Cal.2d 617, 621-624 [327 P.2d 897]; and BAJI No. 3.45.) The instruction was proper in relation to the previous statutory requirements concerning the right of way and turning. It was improper and confusing in connection with the instructions on speeding. (See *Hilts* v. *County of Solano* (1968) 265 Cal.App.2d 161, 172 [71 Cal.Rptr. 275]; *Miller* v. *Northwestern Pac. R. R. Co.* (1962) 206 Cal.App.2d 500, 502 [24 Cal.Rptr. 99]; and "Use Note[s]" following BAJI Nos. 3.45 and 5.31.) Defendant claims that plaintiff was thereby given two excuses for not complying with the prima facie law, first, reliance on the basic speed law, and second, reliance on the provisions of the general exception to statutory negligence.

On analysis it appears, however, that the misplacing of the proper instruction in erroneous order benefited, rather than prejudiced, the defendant. If the jury found that the plaintiff's speed exceeded 25 miles per hour they would find evidence of negligence, and then turn to the basic speed law. If in considering the latter they were confused by the following instruction, they would place the burden on the plaintiff to prove by a preponderance of the evidence that her violation of the 25 mile per hour limit was justifiable, thereby relieving the defendant of the burden of proving a violation of the basic speed law by the plaintiff. (See Veh. Code, § 40831; *Rivera* v. *Parma* (1960) 54 Cal.2d 313, 317 [5 Cal.Rptr. 665, 353 P.2d 273]; *Mapes* v. *Yowell* (1960) 54 Cal.2d 231, 233 [5 Cal.Rptr. 159, 352 P.2d 527, 87 A.L.R.2d 536]; and *Miller* v. *Northwestern Pac. R. R. Co., supra*, 206 Cal.App.2d 500, 502.)

The instructions given by the trial court were correct statements of the law. Any lack of completeness was waived by defendant's failure to submit supplementary instructions. The erroneous sequence in which the instruction on justification was given prejudiced the plaintiff, not the defendant, so no miscarriage of justice had been demonstrated. (See Cal. Const., art. VI, § 13; and *People* v. *Watson* (1956) 46 Cal.2d 818, 831-832 and 834-837 [299 P.2d 243].)

## III

Defendant complains of misconduct of counsel in seven different spheres, six of which are found in plaintiff's opening and closing arguments to the jury. She acknowledges that when confronted by misconduct of counsel an adversary generally must, first, object or otherwise direct the court's attention to the misconduct,[3] and, second, move for a mistrial or seek a curative admonition.[4] She points out, however, that there are situations where the misconduct is so serious that

---

[3]"Generally a claim of misconduct is entitled to no consideration on appeal unless the record shows a timely and proper objection and a request that the jury be admonished. [Citations.] The purpose of the rule requiring the making of timely objections is remedial in nature, and seeks to give the court the opportunity to admonish the jury, instruct counsel and forestall the accumulation of prejudice by repeating improprieties, thus avoiding the necessity of a retrial . . . . In the absence of a timely objection the offended party is deemed to have waived the claim of error through his participation in the atmosphere which produced the claim of prejudice." (*Horn* v. *Atchison, T. & S. F. Ry. Co.* (1964) 61 Cal.2d 602, 610 [39 Cal.Rptr. 721, 394 P.2d 561] [cert. den., 380 U.S. 909 (13 L.Ed.2d 796, 85 S.Ct. 892)]. See also *Sabella* v. *Southern Pac. Co.*, 70 Cal.2d 311, 318-319 [74 Cal.Rptr. 534, 449 P.2d 750] [cert. den., 395 U.S. 960 (23 L.Ed.2d 746, 89 S.Ct. 2100)]; *People* v. *Wein* (1958) 50 Cal.2d 383, 395-396 [326 P.2d 457] [overruled on other grounds; *People* v. *Daniels* (1969) 71 Cal.2d 1119, 1140 [80 Cal.Rptr. 897, 459 P.2d 225, 43 A.L.R.3d 677)]; *People* v. *Sawyer* (1967) 256 Cal.App.2d 66, 78 [63 Cal.Rptr. 749]; *Causey* v. *Cornelius* (1958) 164 Cal.App.2d 269, 273-274 [330 P.2d 468]; *Davis* v. *Franson* (1956) 141 Cal.App.2d 263, 272 [296 P.2d 600]; *McCullough* v. *Langer* (1937) 23 Cal.App.2d 510, 522 [73 P.2d 649]; *People* v. *Nolan* (1932) 126 Cal.App. 623, 641-642 [14 P.2d 880]; *People* v. *Dykes* (1930) 107 Cal.App. 107, 118 and 119 [290 P. 102]; 4 Witkin, Cal. Procedure (2d ed. 1971) Trial, § 163; pp. 2983-2984; and Cal. Civil Procedure During Trial (Cont.Ed.Bar 1960) § 19.38, pp. 474-475.)

[4]In *McCullough* v. *Langer, supra,* 23 Cal.App.2d 510, the court ruled, "The jury were again told that they must disregard statements of counsel which were not supported by the evidence. [¶] We must assume that the jurors understood and followed these admonitions of the court. We do not approve of exaggerated statements of the evidence or appeals to the sympathy or prejudices of jurors, which are too frequently resorted to by counsel in their arguments to juries. Unwarranted and deliberate attacks upon the credibility or motives of witnesses are unjustifiable. It is the province of trial judges to prevent such abuses. But of course it is the privilege of an attorney to draw any inference with respect to the facts or the credibility of witnesses of which the evidence is reasonably susceptible. [Citations.] We must assume that the common sense of most jurors will aid them in distinguishing reasonable deductions of evidence from fanciful distorted constructions thereof. The errors of these challenged statements, if any such exist, were waived by failing to request the court to direct the jury to disregard them. [Citations.] Moreover, the court of its own motion did in general terms instruct the jury to disregard them. We are of the opinion they were not prejudicial, and certainly they do not constitute reversible error under the circumstances of this case." (23 Cal.App.2d at pp. 522-523. See also *Sabella* v. *Southern Pac. Co., supra,* 70 Cal.2d 311, 320; *Scally* v. *Pacific Gas & Electric Co.* (1972) 23 Cal.App.3d 806, 815 [100 Cal.Rptr. 501]; *People* v. *Sawyer, supra,* 256 Cal.App.2d 66, 78-79; *Davis* v. *Franson, supra,* 141 Cal.App.2d 263, 271-272; 4 Witkin, *op.cit.,* Trial, § 164, pp. 2984-2985; and Cal. Civil Procedure During Trial, *op.cit.,* § 19.41, p. 475.)

it may be reviewed on appeal despite a failure to object,[5] and that it has been noted that where misconduct is persistent an admonition may be inadequate to cure the resulting prejudice.[6] Moreover, in order to evaluate the defendant's claim that the judgment, as modified by the trial court, is so excessive as to shock the conscience and give rise to a presumption that it was the result of passion and prejudice (see part IV below), it is necessary to review the record on the question of the plaintiff's counsel's contribution to such a result.

A

Evidence Code section 1155 provides: "Evidence that a person was, at the time a harm was suffered by another, insured wholly or partially against loss arising from liability for that harm is inadmissible to prove negligence or other wrongdoing." "The evidence is regarded as both irrelevant and prejudicial to the defendant. Hence, not only is it subject to objection and exclusion, but any attempt to inject it by question, suggestion or argument is considered misconduct of counsel, and is often held reversible error. [Citations.]" (Witkin, Cal. Evidence (2d ed. 1966) § 374, pp. 332-333. See also *Scally* v. *Pacific Gas & Electric Co.* (1972) 23

---

[5]In *Love* v. *Wolf* (1964) 226 Cal.App.2d 378 [38 Cal.Rptr. 183], it was contended that the appellate court should refuse to recognize the misconduct because defendants did not always object or ask that the jury be admonished. The court answered, "As any experienced trial lawyer knows, multiple objections have a tendency to alienate a jury's good will; particularly when, as in this case, the judge fails to rule on the objections made. And here many instances of misconduct *were* objected to. As for curing error by admonishing a jury, while this may be possible when error is isolated and unemphasized, an attempt to rectify repeated and resounding misconduct by admonition is, as counsel here has expressed it, like trying to unring a bell. [Citations.]" (226 Cal.App.2d at p. 392. See also *Garden Grove School Dist.* v. *Hendler* (1965) 63 Cal.2d 141, 143-144 [45 Cal.Rptr. 313, 403 P.2d 721]; *Estate of Moore* (1919) 180 Cal. 570, 586 [182 P. 285]; *People* v. *Andrews* (1970) 14 Cal.App.3d 40, 48 [92 Cal.Rptr. 49]; *People* v. *Sawyer, supra,* 256 Cal.App.2d 66, 77-78; and 4 Witkin, *op.cit.,* Trial, § 165, pp. 2985-2986. Cf. *People* v. *Nolan, supra,* 126 Cal.App. 623, 642.)

[6]In *Kenworthy* v. *State of California* (1965) 236 Cal.App.2d 378 [46 Cal.Rptr. 396], the court noted: "There was a deliberate attempt to administer poison, no single dose of which was lethal but with an accumulative effect inevitable and realized." (236 Cal.App.2d at p. 398.) It concluded, "The court in denying defendant's motion for a new trial felt that its admonitions had been an antidote sufficient to counteract the venom. The judge saw and heard the actors; we merely read the transcript. But the grossly excessive verdict (which the judge reduced by $95,000) as we have shown argues forcefully a verdict tainted by bias and resulting from prejudice." (*Id.,* p. 401. See also Traynor, C. J., dissenting, *Sabella* v. *Southern Pac. Co., supra,* 70 Cal.2d 311, 324-325; *Hoffman* v. *Brandt* (1966) 65 Cal.2d 549, 554-555 [55 Cal.Rptr. 417, 421 P.2d 425]; *People* v. *Wein, supra,* 50 Cal.2d 383, 396-397; *People* v. *Sawyer, supra,* 256 Cal.App.2d 66, 77-78; *Love* v. *Wolf, supra,* 226 Cal.App.2d 378, 392; and *Cordi* v. *Garcia* (1940) 39 Cal.App.2d 189, 197 [102 P.2d 820].)

Cal.App.3d 806, 812-814; 4 Witkin, Cal. Procedure (2d ed. 1971) Trial, § 169, pp. 2991-2992; and Cal. Civ. Procedure During Trial (Cont.Ed. Bar 1960) § 19.28, p. 471. Cf. *Causey* v. *Cornelius* (1958) 164 Cal.App.2d 269, 275-280 [330 P.2d 468].)

Defendant also suggests that any reference to the fact that she is insured violates the principle embodied in the collateral source rule, which permits the injured person to recover damages from the wrongdoer undiminished by any payment he may have received for the injury from a source wholly independent of the wrongdoer. (See *De Cruz* v. *Reid* (1968) 69 Cal.2d 217, 223-225 [70 Cal.Rptr. 550, 444 P.2d 342].) Apparently she, as a wrongdoer, feels that she should not be prejudiced because the jury, with knowledge that she will be indemnified from a collateral source, may not evaluate her defense fairly. It is unnecessary to consider this reed; defendant's contention, if sustainable, may be grounded on the general proposition expounded in the Evidence Code, as applied by the courts.

Defendant's citations of plaintiff's reference to defendant's insurance carrier in the pleading stage in connection with a motion to advance the case for trial, and in plaintiff's statement for settlement and pre-voir dire conferences appear to be irrelevant. They do not involve any attempt, designed or inadvertent, to bring improper matter before the jury. The same comment applies to defendant's references to insurance in chambers, out of the presence of the jury, during the course of the trial. The first instance at the end of the first day of trial was in connection with plaintiff's motion for a mistrial predicated on what her counsel believed was an attempt by defense counsel to shift liability to the City of San Mateo by showing, through the investigating officer, that there had been other accidents at the intersection and an investigation made to see what could be done to prevent them. In the course of argument on the motion plaintiff's counsel noted that the defendant's policy limit was $100,000, and he wanted to avoid any evidence of activity by the city which might reduce the verdict. Defendant's attorney did object to plaintiff's approach insofar as "he is going to drag in insurance by its heels into the matter." The court noted that there was no possible reason for defendant to complain to the reference made in the absence of the jury.[7] The

---

[7]The court when requested by plaintiff's counsel to admonish defendant's counsel addressed himself to both counsels as follows: "I have known both of you for a long time and I know that you are both experienced lawyers and you both have already asked some questions that you both know better about and since we are all going to be here another week and a half why don't we all behave like professionals . . . I have a rather low tolerance for this sort of thing." Each acknowledged the admonition.

second instance occurred when court next reconvened for the trial, and counsel and the judge met with a juror who confessed he had forgotten, when asked on voir dire, that he had been involved in an automobile accident over five years previously. There had been a lawsuit, but all claims· had been settled right after it was filed. Plaintiff's attorney examined the juror and elicited that there was approximately $125 damages to the other party and a complaint of a bruised leg and contusions on the forehead. In the course of his questioning, counsel ascertained that the accident was reported to the juror's "carriers," and when he sought to elicit the name of the insurer the court sustained defendant's objection, stating, "I don't see what difference it would make." At the conclusion of the examination neither party objected to the juror continuing, and he became foreman of the jury.

Defendant lists 12 instances in which the plaintiff used the term "defense interest" to refer to the defendant. These references are found once in the opening statement, three times in the examination of the physician who examined the plaintiff on behalf of the plaintiff, once while examining the plaintiff, four times in his opening argument, and three times in his closing argument. In opening argument there was a pointed reference to defendant's attorney as one who "does more work for [sic] San Mateo County for defense interests." Again in closing argument plaintiff's attorney referred to his adversary as "an experienced defense counsel," and followed it with the statement, "If the defense interests in this case in connection with a verdict of this nature had to pay that money [$37,346.45, the defense's suggested figure if liability was established], it would be the greatest victory that Mr. Cotter would have had in his life and it would have been in this courtroom and the only man that would be exulted would be Mr. Cotter, they would raise him on the shoulders and parade him down the block and say, 'We have done it again, we have done it again!' " The other references, although designed to deprive the defendant of any personal charm that might be developed by her appearance in court and her testimony, are more obtuse if designed to attain the nefarious end now belatedly charged. It is significant that no objection or request for an admonition was made to the use of the terms at any time during the trial, even to the more flagrant examples referred to above. The only objection was to a statement using the phrase, but it was on other grounds. (See part III-D below.)

Further on the subject of insurance, defendant cites a reference to representatives of the defendant or of her attorney as voiced by counsel

for plaintiff in inquiring of the investigating police officer whether he had discussed the case or been contacted by such representatives. There was no intimation that any such representative might be other than an associate or an employee of the defendant's attorney. No objection was interposed.

In the examination of the defendant as an adverse witness, counsel was more pointed. In attempting to impeach her statement that the accident occurred at 8:15 a.m., counsel asked, "Did you tell any of your representatives that this accident took place at 8:27 in the morning? " An objection was sustained to this question, which followed an improper question violating the attorney-client privilege. That question was apparently withdrawn in the face of defendant's earlier objection. In questioning about the extent of the damage to the defendant's car, after ascertaining that it had extensive front end damage and was "totalled," counsel asked, "Do you recall who handled the property damage?" An objection on the grounds of immateriality was sustained, but counsel persisted and asked, ". . . who was the person that indicated to you that it was totalled?" He withdrew the question in the face of further objection. It developed that her husband handled the matter of disposition of the car. The inference that the defendant may have had collision insurance was certainly immaterial. No admonition was requested, but it could hardly be considered as necessary. The plaintiff was entitled to explore the physical damage to defendant's car as it might relate to the severity of the collision, and its cause, and she was also entitled to show that there was injury to defendant's property—and her person too—which was not made the subject of cross-complaint, although it was contended that plaintiff was negligent. Subsequently, in cross-examining the defendant after the witness had testified that she did not know who took certain photographs of the damaged vehicles, counsel asked, "Did a representative for you take those photographs?" No objection was interposed, but the witness again indicated her ignorance of the subject. A few questions later he repeated, "Do you know who took the pictures?" Undeterred by her negative reply, he secured her admission that she had first seen the pictures when her attorney showed them to her. He then pressed on and asked, "Do you know how he got them?" and again received a negative reply. At this point, although no objection had been interposed, the court interjected, "Get off the subject." Counsel, nevertheless, then went through the same routine with pictures of the accident scene, and received the same negative reply to inquiries concerning who took the pictures, and when they were taken.

■ Since a prompt objection and admonition could have stopped and prevented the references to "defense interests" the defendant is in no position to urge misconduct by the use of that term. (See fns. 3 and 4 above.) The references to representatives are ambiguous at best, and also suffer from lack of objection. It would appear that if counsel really felt that the issue of insurance had been improperly interjected into the case, he could have asked for an instruction along the lines of BAJI No. 1.04 which, in part, provides, "No insurance company is party to this action. You must refrain from any inference, speculation, or discussion about insurance." Granted that such an instruction may blow smoldering coals into a blazing fire of speculation, still if defense counsel thought such speculation would occur anyway, he could have used it to soften the blow. In *Scally* v. *Pacific Gas & Electric Co., supra,* on which defendant relies, the court stated, "Whether counsel's improper reference to insurance constitutes prejudicial misconduct in a closely balanced case which cannot be cured by the court's admonition [citations] is determined by the court's view of the overall record, taking into account inter alia the nature and seriousness of the remarks, the good faith of counsel, whether the misconduct consisted of a single utterance or repeated, persistent reiteration thereof, the judge's control of the trial and the probable likelihood of prejudicing the jury [citations]." (23 Cal.App.3d at p. 814.) Applying these principles and those adverted to above (see fns. 3 and 4), we believe there was no demonstrable prejudicial misconduct in hinting at the existence of insurance.

The foregoing renders it unnecessary to consider the trial court's comments in ruling on the motion for new trial. He considered the existence of insurance as a matter which was understood and considered by every intelligent juror. (See *Causey* v. *Cornelius, supra,* 164 Cal.App.2d 269, 275-280.)

B

In *People* v. *Wein* (1958) 50 Cal.2d 383 [326 P.2d 457], the court recognized that ". . . the practice of addressing individual jurors by name during the argument should be condemned rather than approved, . . ." (50 Cal.2d at p. 395. See also *People* v. *Sawyer* (1967) 256 Cal.App.2d 66, 78 [63 Cal.Rptr. 749]; 4 Witkin, Cal. Procedure, *op. cit.,* Trial, § 176, subd. (2), p. 2999; Cal. Civil Procedure During Trial, *supra,* § 19.31, p. 472; and Annotation (1957) 55 A.L.R.2d 1198.)

Plaintiff commenced his opening argument as follows: "Ladies and Gentlemen of the jury, Mr. Cotter, Judge Cohn—Mrs. Feliciano started this case with her hands grasped tightly in her lap and now we are getting more nervous because we have no idea what your verdict will be or how this will come out one way or the other." Although the foregoing statement indicates an attempt to establish a rapport with the named juror, it involved no special appeal to her on the merits of the case because of her sex, occupation, race or other objective factors. In content the remark appears harmless. There was no objection (see fn. 3 above), and any implication of rapprochement could have been obviated by a word from the court (see fn. 4 above). As stated in *People* v. *Wein, supra,* "[I]t does not follow that such conduct is necessarily prejudicial in any given case." (50 Cal.2d at pp. 395-396.) Here an objection would have been frivolous, and, by the same token, so is defendant's attempt to raise the question on appeal.

## C

In *Bessette* v. *The State* (1884) 101 Ind. 85, the prosecutor in closing argument stated, " ' . . . The defence has already succeeded, perhaps in making a young man on the jury believe that this is a blackmailing scheme. I think I know who he is, and I think he has become greatly impressed with that theory.' " (101 Ind. at pp. 89-90.) The court stated, "The personal allusion made to the probable state of mind of one of the jurors was yet more reprehensible. To be thus singled out from his fellow jurors, and put under surveillance, was well calculated to impair the independence of mind and judgment which it was the right and duty of the juror to maintain, until convinced by the evidence and the fair and legitimate argument of counsel." (*Id.,* p. 90.)

 In the course of his opening argument in between arguing defendant's negligence and the absence of plaintiffs' contributory negligence, counsel parenthetically stated, "There are certain things I can do and there are certain things I can't do. I can only do as a human being what I can do. I know that there are one—at least one of you on the jury that won't probably listen to my argument and has made up his mind already. I hope—I hope the person will remain open-minded and will listen on an objective basis throughout all of the argument, but in connection with this case, what is important when you have an objective mind, you will see these factors that are exposed to you." This statement was not on its face directed at any particular juror as was that in the case

upon which defendant relies. Plaintiff claims it is a "wake-up" tactic to retain the jurors' attention. In her closing brief defendant suggests, on the basis of some off-the-record remarks at the conclusion of the trial, that it was intended to apply to the juror who had been voir dired after confessing a failure to reveal what he had momentarily forgotten. There is nothing in the record to suggest such a relationship. Be that as it may, here unlike the cited case, there was no objection by the adverse party (see fn. 3 above). It is impossible to see how the other jurors would determine who was singled out for surveillance. There is, however, a slight possibility that any jury might be hesitant to speak out against plaintiff's case for fear of being branded as one who made up his mind in advance. The use of such an "awakener" in other than the subjunctive is therefore disapproved. Nevertheless, in this case no misconduct has been demonstrated, much less any prejudice.

## D

Defendant complains of three alleged misstatements of law by plaintiff's counsel. To only one of these did the defendant interpose an objection.

In his opening statement defendant's counsel stated, "You will learn from the evidence that a [sic] seemingly innocent as this intersection may appear in the rough unscaled diagram that it is an extremely dangerous intersection." He elaborated on the various factors which gave rise to this condition. In opening argument plaintiff's counsel began with a number of irrelevancies concerning the jury system, his personal interest in it, and the manner in which his adversary was conducting the case, particularly with reference to the latter's opening statement. After rambling around, he stated, "There was . . . a statement made that this is an extremely dangerous intersection. This is not relevant to the case. If this was an extremely dangerous intersection, then the defense interests could have turned around and sued the City of San Mateo—" Defendant's counsel promptly interjected, "That is a misstatement of the law. I hate to object in argument, I really do, but I think that is a misstatement of the law—". At the court's request counsel approached the bench and an unreported discussion was held. Plaintiff's counsel then returned to the attack with, "Well, after the statement at the bench there is no evidence of it being a dangerous intersection." Defendant's objection was greeted with the following comment by the court, "Why not eliminate the whole problem, let's get on to what this case is about." After a few more extraneous remarks directed at the defendant's opening

statement, one of which is considered below, plaintiff's counsel returned to the rules of law governing the burden of proof and the evidence in the case. He subsequently properly pointed out that the obstructions present were of no consequence because the responsibility was on the driver entering the through highway to exercise caution under the conditions as she found them. (See part I above.)

Defendant points out that the defendant, if negligent, could not recover for her own injuries or for indemnification of any damages awarded the plaintiff, against the City of San Mateo for its concurrent negligence, if established, in maintaining a dangerous intersection. (See *Taggart* v. *State of California* (1975) 45 Cal.App.3d 768, 770-771 [119 Cal.Rptr. 696]; and *Pearson Ford Co.* v. *Ford Motor Co.* (1969) 273 Cal.App.2d 269, 271-273 [78 Cal.Rptr. 279].) It would be improper to suggest that defendant had a right to indemnity which would reduce her loss if she were held liable. (Cf. *De Cruz* v. *Reid, supra,* 69 Cal.2d 217, 223; and *Robledo* v. *City of Los Angeles* (1967) 252 Cal.App.2d 285, 294-296 [60 Cal.Rptr. 328].) The statement by counsel did not carry that implication. It was argumentative in nature, as was another statement, unobjected to but referred to on appeal, to the effect that if the defendant believed the plaintiff was negligent she should have sued the plaintiff to recover for her injuries. Both were statements of something extraneous to the record used to encourage a finding of, in one instance, lack of defendant's caution at the intersection, and in the second, lack of contributory negligence of plaintiff.

The error was objected to, but it does not appear that defendant requested any admonition with respect to the original remark of counsel. The prejudice, if any there was, from the introduction of this extraneous matter into the case could have been cured by an admonition. (See fn. 4 above.) The second statement, after the colloquy at the bench, to which an objection was made, returned to a discussion of the evidence. Although it appears to have been incorrect on the face of the record, the determination of what the evidence was and the ultimate facts to be found therefrom were for the jury, and they were so instructed. No cognizable prejudicial error is found in the incident last reviewed.

In his opening statement defendant's counsel stated, "We hope to show that the accident from the defendant's point of view was inescapable." Immediately following the incident reviewed above, plaintiff's counsel, still reviewing his adversary's opening statement, com-

mented, "In connection with the statement made like this was an unavoidable accident, this was formerly the law and that was in existence approximately ten years ago and carries no merit." No objection was interposed, but defendant now contends that it was misconduct to so state, because it was an erroneous statement of law which deprived her of an opportunity to show that the accident was in fact unavoidable and not proximately caused by any negligence on her part.

In *Butigan* v. *Yellow Cab Co.* (1958) 49 Cal.2d 652 [320 P.2d 500], the court ruled that it was erroneous to give an instruction on unavoidable accident[8] because it was unnecessary and confusing under the circumstances of that case. (49 Cal.2d at pp. 657-660. See also *Bridgman* v. *Safeway Stores, Inc.* (1960) 53 Cal.2d 443, 449-450 [2 Cal.Rptr. 146, 348 P.2d 696]; *Dufour* v. *Henry J. Kaiser Co.* (1963) 215 Cal.App.2d 26, 28-29 [29 Cal.Rptr. 871]; 4 Witkin, Summary of Cal. Law, *op.cit.,* Torts, § 503, pp. 2768-2770; and 35 Cal.Jur.2d Negligence, §§ 205-206, pp. 725-726.) In *Butigan* the court observed: "In the modern negligence action the plaintiff must prove that the injury complained of was proximately caused by the defendant's negligence, and the defendant under a general denial may show any circumstance which militates against his negligence or its causal effect. The so-called defense of inevitable accident is nothing more than a denial by the defendant of negligence, or a contention that his negligence, if any, was not the proximate cause of the injury. [Citations.]" (49 Cal.2d at pp. 658-659. See also Witkin, *op.cit.*)

The failure of defendant to make an objection precludes his raising an objection at this point. (See fn. 3 above.) The plaintiff has defended her counsel's remarks on the grounds of revised rules governing pleading and instructions. On the other hand, the statement in *Butigan* by its very nature recognized that in some situations the factors which proximately cause the accident may be so far beyond the reasonable anticipation and control of the parties as to in fact demonstrate that the parties were not negligent, or if negligent, that such negligence was not a proximate cause

---

[8]An example of this instruction is found in *Bridgman* v. *Safeway Stores, Inc.* (1960) 53 Cal.2d 443, in a footnote at page 449 [2 Cal.Rptr. 146, 348 P.2d 696]. It reads, " ' . . . in law we recognize what is termed an unavoidable or inevitable accident. These terms do not mean literally that it was not possible for such an accident to be avoided. They simply denote an accident that occurred without having been proximately caused by negligence. Even if such an accident could have been avoided by the exercise of exceptional foresight, skill or caution, still no one may be held liable for injuries resulting from it.' " (See also 1 BAJI (4th ed. 1956) No. 134; and cf. comment BAJI (5th ed.) comment following BAJI No. 3.21 (unavoidable accident).)

of the accident. (See *Rayner* v. *Ramirez* (1958) 159 Cal.App.2d 372, 376-377 [324 P.2d 83].) As Witkin notes, the defendant may offer evidence to show that the accident was caused by circumstances beyond the control of an ordinary prudent person. (Witkin, *op.cit.,* p. 2769.) These principles could have been explained to the jury if proper objection had been made. It was questionable, however, whether this is such a case. The defendant claimed the condition at the intersection relieved her of the duty, or made it impossible for her, to comply with the requirements of Vehicle Code section 21802. As we have seen, those conditions only increased the degree of caution necessary. (See part I above.) There was no cognizable prejudicial error in the statement on unavoidable accident.

A third alleged misstatement of law is noted in plaintiff's counsel's closing argument when he commented on the failure of the defendant to produce as witnesses three experts, who had been listed as potential witnesses in defendant's pre-voir dire conference statement as required by local rules of court. The witnesses referred to were an engineer, a physicist and a certified public accountant. Concededly, although it is not reported, their names and titles had been read to the prospective jurors in connection with the impanelment of the jury. In defendant's opening statement there was a reference to the visibility at the intersection being less than might be desired by traffic engineers who study and design roadways. There was not, however, any mention of those witnesses, by name, title or by reference to testimony to be produced. Nevertheless, the plaintiff did inject some references to the defendant's potential expert witnesses in the record without objection on her part. He asked the investigating officer whether he had ever been contacted by the named persons, who had been listed as physicist and engineer respectively, and received a negative reply. In cross-examination of the draftsman, who prepared a diagram of the intersection for the defendant, he brought out that the draftsmen had listened to named individuals, apparently the physicist and the engineer, talking about what evaluation there was as to the collapsed damage to either car. His attempt to ascertain under what circumstances the draftsman overheard the experts was forestalled by an objection from the defendant.

In opening argument in discussing the pictures of the cars and the damage depicted therein, plaintiff's counsel, without objection, stated, "It was never measured by the experts, Yoshida and Sholes, because it would have established without any question of a doubt that Mrs.

Neumann's car was travelling way below 25 miles an hour, kinetic energy would have shown 5 to 10 miles an hour." He also pointed out in reference to his expert's testimony as to loss of earnings, "No accountant came in on behalf of the defense interest in this case to dispute these figures and the accountant was scheduled to come in. His name was read to you but he did not come in, because the figures are not to be disputed."

In closing argument, the attorney, in discussing the evidence of speed referred to the engineer and the physicist by name, and asked where they were. He asked the jury to infer that the failure to call the accountant as a witness established the creditability of plaintiff's evidence concerning her earnings, past and prospective. Shortly thereafter, in discussing speed, he continued: "With regard to this case, if I may be so bold, the reason these people weren't brought in is because they could not complement the defense's interests in this case. Yet, they had been conversed with about this case and yet the defense elected not to bring them into court. *The court will give you the instruction that if they failed to bring in evidence that they had intended to bring in in the first place that you are to look upon whatever might have resulted from that evidence in a highly suspicious manner."* (Italics added.)

All of the foregoing references were elicited by plaintiff without objection. Defendant now complains that it was prejudicial misconduct to tell the jury that the court would instruct as last outlined above, when counsel knew that no such instruction would be given.

■ "While a counsel in summing up may indulge in all fair arguments in favor of his client's case, he may not assume facts not in evidence or invite the jury to speculate as to unsupported inferences." (*Malkasian* v. *Irwin* (1964) 61 Cal.2d 738, 747 [40 Cal.Rptr. 78, 394 P.2d 822].)

"While the trial judge properly may insist that counsel not undertake to tell the jury what he, the judge, will say, it is quite another matter to preclude him from discussing the pertinent law and its application to the facts. That is the attorney's right as advocate of his client's cause. In *People* v. *Molina*, 126 Cal. 505, 508 . . . the Supreme Court said: 'In the leading case of *Tucker* v. *Henniker*, 41 N.H. 323, it is said: "The right of discussing the merits of the cause, both as to the law and facts, is unabridged. The range of discussion is wide. He may be heard in argument upon every question of law . . . ."' *People* v. *Dykes*, 107

Cal.App. 107, 118 . . . : 'That counsel may, in his argument, state what the law is and apply the law to the facts in the case is well established in California, provided, of course, the statement of what he considers the law to be is correct.' This language was quoted in *De Armas* v. *Dickerman,* 108 Cal.App.2d 548, 553 . . . ." (*Hodges* v. *Severns* (1962) 201 Cal.App.2d 99, 114 [20 Cal.Rptr. 129]. See also *People* v. *Dykes* (1930) 107 Cal.App. 107, 118 [290 P. 102].)

Here the court instructed the jury, "In determining what inferences to draw from the evidence or facts in the case against the party, you may consider, among other things, the party's failure to explain or to deny by his testimony such evidence or facts." (See Evid. Code, § 413; and BAJI No. 2.04.) ▇ It was proper for the plaintiff to comment on the defendant's failure to produce evidence to rebut that testimony offered by the plaintiff to show that she was not violating the basic speed law, and that evidence which showed a computation of her loss of earnings.

▇ Plaintiff's counsel's comments went further than to merely comment on the dearth of contrary evidence. He apparently engaged in a studied attempt to make capital out of defendant's failure to produce the potential witnesses, and further erroneously advised the jury that the court would advise them to speculate that there was something suspicious about defendant's failure to produce those witnesses. Evidence Code section 412 provides, "If weaker and less satisfactory evidence is offered when it was within the power of the party to produce stronger and more satisfactory evidence, the evidence offered should be viewed with distrust." Evidence Code section 413 provides: "In determining what inferences to draw from the evidence or facts in the case against a party, the trier of fact may consider, among other things, the party's failure to explain or to deny by his testimony such evidence or facts in the case against him, or his willful suppression of evidence relating thereto, if such be the case." Although the jury was properly instructed on the first part of section 413 (BAJI No. 2.04, *supra*), no instruction was offered or given setting forth the provisions of section 412 (BAJI No. 2.02. See Witkin, Cal. Evidence (2d ed. 1966) § 1127, p. 1043) or the last portion of section 413 (Instruction No. 2.03. See Witkin, *op. cit.,* § 1128, pp. 1143-1145). Plaintiff's comments were erroneous, not only because no such instruction as indicated was proposed or given, but also because it would have been error to give either of the recognized instructions.

In *Hays* v. *Viscome* (1953) 122 Cal.App.2d 135 [264 P.2d 173], the court held it was error to refuse to permit the plaintiff to show that at the request of the defendant she had been examined by a doctor of his selection whom the defendant failed to call as a witness, and that the error was not cured by the giving of an instruction in language substantially similar to that now found in BAJI Instruction No. 2.02. (See Evid. Code, § 412; and former Code Civ. Proc., § 2061, subd. 7.) The court commented, "It was a situation which made peculiarly applicable the rule that where a party has an opportunity to call a witness who is prepared and qualified to testify as to a fact in issue and fails to do so, it may be inferred by the trier of fact that the evidence if given would be adverse to such party . . . . The general principle is stated in section 2061, subdivisions 6, 7, Code of Civil Procedure . . . . If the evidence is found to have been wilfully suppressed it will be presumed that it would have been adverse. (Code Civ. Proc., § 1963, subd. (6); . . ." (122 Cal.App.2d at pp. 138 and 139.)

These rules are inapplicable to this case. There is nothing to show that any of the persons named by the defendant in the pre-voir dire conference statement, at the peril of being unable to call them unless named, were prepared and qualified to testify to any fact in issue, nor was it shown that any of them was a participant in or actual witness of the collision. (Cf. *King* v. *Karpe* (1959) 170 Cal.App.2d 344, 347-348 [338 P.2d 979]; and see *Ferrate* v. *Key System Transit Lines* (1958) 165 Cal.App.2d 391, 394 [331 P.2d 991].) In general there is no duty on either party to call any particular witness in the absence of a showing of some special circumstances. (See *Keena* v. *United Railroads* (1925) 197 Cal. 148, 157 [239 P. 1061]; *Estate of Moore* (1919) 180 Cal. 570, 586 [182 P. 285]; *Provincio* v. *Merrick* (1970) 5 Cal.App.3d 39, 41 [84 Cal.Rptr. 882]; *Patton* v. *Royal Industries, Inc.* (1968) 263 Cal.App.2d 760, 768-769 [70 Cal.Rptr. 44]; *Jackson* v. *Barnett* (1958) 160 Cal.App.2d 167, 173 [324 P.2d 643]; *Davis* v. *Franson* (1956) 141 Cal.App.2d 263, 270 [296 P.2d 600]; *Ericson* v. *Petersen* (1953) 116 Cal.App.2d 106, 111-112 [253 P.2d 99]; and *Holland* v. *Kerr* (1953) 116 Cal.App.2d 31, 36-37 [253 P.2d 88].) In *Davis* v. *Franson, supra,* the court observed, "It is sufficient to note at this point that a party to an action is not guilty of 'wilful suppression' of evidence (giving rise to the presumption set forth in section 1963, subdivision 5 of the Code of Civil Procedure 'that evidence wilfully suppressed would be adverse if produced') by merely failing to call a potential witness to the stand. Counsel for a party to a civil action has not only the right but the duty to exercise discrimination in selecting the

witnesses for whom his client vouches. Assuming, of course, his honesty and good faith, an attorney may not believe the account of such a potential witness, or may think that he is inaccurate or prejudiced or otherwise disqualified to testify." (141 Cal.App.2d at p. 270.)

Moreover, insofar as the plaintiff's counsel was attempting to indicate that the defendant had wilfully suppressed evidence (Evid. Code, § 413; and BAJI No. 2.03), he was clearly in error. " 'While the rule is well settled that when the evidence tends to prove a material fact which imposes a liability on a party, and he has it in his power to produce evidence which from its very nature must overthrow the case made against him if it is not founded on fact, and he refuses to produce such evidence, the presumption arises that the evidence, if produced, would operate to his prejudice and support the case of his adversary [citation], still the failure to call such witness does not amount to a willful suppression of evidence, as was strongly indicated by respondent's counsel in the instant case.' " (*Keena* v. *United Railroads, supra,* 197 Cal. 148, 157-158. See also *Estate of Moore, supra,* 180 Cal. 570, 586.)

The record fails to show that those referred to had investigated or formed any opinion as to the cause of the accident or in relation to other facts in issue in this case. From all that appears they merely may have been used by the defendant's attorney to prepare himself for the case, or to meet matters anticipated, but not presented by plaintiff. They may have played no greater part in defendant's case than the photographer in *Holland* v. *Kerr, supra.* It was pure speculation to assume that the failure to present those witnesses was because they would give testimony favorable to plaintiff. The court would have been in error in giving an instruction along the lines suggested by defendant on such a flimsy foundation. Moreover, if proper objection had been interposed the court would have been obliged to cut short plaintiff's comments with reference to those prospective witnesses and to admonish the jurors to disregard what had been said. The record, however, fails to reveal any objection except that which cut short the cross-examination of the draftsman. On this point, as well as the "unavoidable accident" incident, the principle that appropriate objection must be made to give the court an opportunity to admonish the jury, instruct counsel, and forestall the circumstances of prejudice by repeated improprieties, is particularly applicable. (See fns. 3 and 4 above.)

No reversible prejudicial error is found in defendant's complaints concerning plaintiff's counsel's misstatements of the law.

E

In *Beagle* v. *Vasold* (1966) 65 Cal.2d 166 [53 Cal.Rptr. 129, 417 P.2d 673], the plaintiff claimed that the damages awarded were inadequate as a matter of law and that the trial court had erred in restricting the argument of counsel on general damages. The court made it clear that an attorney may inform the jury as to the total amount of the general damages sought by the plaintiff, that the attorney could read the complaint, including the prayer to the jury, and that the trial court may apprise the jury that the plaintiff claims a certain sum and that no greater sum may be awarded (65 Cal.2d at pp. 172-173). It then determined that an attorney may argue to the jury that his client's damages for pain and suffering may be measured in terms of a stated number of dollars for specific periods of time, thereby approving the "per diem" argument. (*Id.,* pp. 173-182, but cf. Traynor, C. J., concurring pp. 183-184.) The court noted, however, "In holding that counsel may properly suggest to the jury that plaintiff's pain and suffering be measured on a 'per diem' basis, we do not imply that we also approve the so-called 'golden rule' argument, by which counsel asks the jurors to place themselves in the plaintiff's shoes and to award such damages as they would 'charge' to undergo equivalent pain and suffering." (*Id.,* p. 182, fn. 11.)

In *Zibbell* v. *Southern Pacific Co., supra,* in reviewing a contention that the judgment, reduced from the verdict as in this case, was excessive, the court commented, after reviewing the reasonable general damages, as follows: "But to put a monetary value upon the elements of physical pain and mental suffering, their nature, extent, and continuance, is a much more difficult and delicate matter. It is, of course, improper for the jury to attempt to measure the damage occasioned by the injury and the sufferings attendant upon it, by asking themselves what sum they would take to endure what the plaintiff has endured, and must endure. Says the supreme court of Wisconsin in *Heddles* v. *Chicago & Northwestern Railway Co.,* 74 Wis. 239 . . . : 'No rational being would change places with the injured man for an amount of gold that would fill the room of the court, yet no lawyer would contend that such is the legal measure of damages.' " (160 Cal. at pp. 254-255. See also *Sabella* v. *Southern Pac. Co.* (1969) 70 Cal.2d 311, 319 [74 Cal.Rptr. 534, 449 P.2d 750]; *Horn* v. *Atchison, T. & S. F. Ry. Co., supra,* 61 Cal.2d 602, 609; *People* ex rel. *Dept. of Public Works* v. *Graziadio* (1964) 231 Cal.App.2d 525, 533-534 [42 Cal.Rptr. 29]; 4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 886(6), pp. 3173-3174; and Annotation, Agreement-Taking Position of Litigant (1960) 70 A.L.R.2d 935. Cf. *Hale* v. *San Bernardino etc. Co.*

(1909) 156 Cal. 713, 716 [106 P. 83]; *De Young* v. *Haywood* (1956) 139 Cal.App.2d 16, 21 [292 P.2d 917]; *McCullough* v. *Langer* (1937) 23 Cal.App.2d 510, 521-522 [73 P.2d 649]; and *Coppock* v. *Pacific Gas & Electric Co.* (1934) 137 Cal.App. 80, 89 [30 P.2d 549].)

■ Defendant cites six occasions in which the plaintiff's counsel in argument requested the jurors to consider what the plaintiff's pain and suffering would be worth to them, or made similar improper argument. In opening argument, when first addressing the question of damages for pain and suffering, he reviewed plaintiff's age and her debilitating injuries, and queried, "This life of independence is gone. What it would be worth to you?" He continued " . . . if you concern yourself with this pain and you could have a moving joint in your body that was constantly moving and every time you moved your major muscle it wouldn't move, what would you pay as an individual to free yourself from that pain, $5 a day, $10 a day? I wouldn't take $150 a day—$250 a day—so let's keep this in mind when you jurors sit down and discuss the plaintiff's case." No objection was interposed to the foregoing remarks. He reviewed her claimed special damages of $109,816 and continued, "Would you trade places with her for $500,000? " Defendant's counsel properly objected, "That is incorrect to ask the jury to put themselves in anyone's place." Plaintiff's attorney's statement, "That is not the law and—" was interrupted by the court's "Let's get on with it." The argument continued, " . . . would you want to go through the anxiety and fear of a bone graft? " Defendant did not, however, pursue his objection or request an admonition.

In closing argument, after requesting the jurors to award a fixed sum per day for pain and suffering for the next eight years, and comparing it with the $5 a day jury fee, counsel queried, "How would you like to sit in that chair for eight hours with a non-unionized femur for ten dollars a day? Would you do it? Why, I tell you, that anyone who suggested that would be full of prunes, Santa Clara prunes." This reference passed without objection, as did a final appeal in which counsel stated, "Someone comes up to you with a handful of diamonds and says, 'This is worth $500,000.00.' Would you take it and would being crippled for the rest of your life be worth it? "

The appeal to a juror to exercise his subjective judgment rather than an impartial judgment predicated on the evidence cannot be condoned. It tends to denigrate the jurors' oath to well and truly try the issue and

render a true verdict according to the evidence. (Code Civ. Proc., § 604.) Moreover, it in effect asks each juror to become a personal partisan advocate for the injured party, rather than an unbiased and unprejudiced weigher of the evidence. Finally, it may tend to induce each juror to consider a higher figure than he otherwise might to avoid being considered self-abasing. Defendant, however, is faced with the observation in *Horn* v. *Atchison, T. & S. F. Ry. Co., supra,* reading, "But we are aware of no California case wherein a plaintiff's verdict was reversed for misconduct during his counsel's argument in the lack of timely objections and a request that the jury be admonished where such an admonishment could be effective. [Citations.]" (61 Cal.2d at p. 611. See fn. 3 above.) We cannot say that a proper objection at the first reference, or a more explicit objection and request for an admonition on the third occasion, would not have prevented or ameliorated whatever prejudice defendant may otherwise have suffered.

## F

In *Sanguinetti* v. *Moore Dry Dock Co.* (1951) 36 Cal.2d 812 [228 P.2d 557], the court quoted from *Starr* v. *United States* (1894) 153 U.S. 614, 626 [38 L.Ed. 841, 846, 14 S.Ct. 919], as follows: " 'It is obvious that under any system of jury trials the influence of the trial judge on the jury is necessarily and properly of great weight, and that his lightest word of intimation is received with deference, and may prove controlling.' " (36 Cal.2d at p. 819.) In *Sanguinetti,* the court, because of the foregoing truism ruled, "that any practice which would include the making of a motion. in the presence of the jury, after production of evidence, to increase the amount of damages asked, and which would bring to the knowledge of the jury the fact that the court after hearing plaintiff's evidence permitted the complaint to be amended by increasing the prayer for damages, should be unhesitantly condemned and stricken down." (*Id.* See also *People* ex rel. *Dept. Pub. Wks.* v. *Lundy* (1965) 238 Cal.App.2d 354, 360-361 [47 Cal.Rptr. 694].) ▮▮ We, therefore, conclude that it is improper and misconduct for counsel to argue that his case or some aspect thereof has judicial approval.

▮▮ In closing argument after making some of the objectionable, but not objected to, remarks which have been reviewed above, plaintiff's counsel adverted to the plaintiff's pain and the question of damages. He stated, "They have reduced this woman to sleeping on a hide-a-way bed on her back and requested that you give her the sum of thirty-seven

thousand dollars. With regard to a complaint that was filed, this complaint for five hundred thousand dollars on the basis of the following, that some people don't have an axe to grind will be at least reasonable with connection with the claim and believe me, ladies and gentlemen, in the event that Mrs. Newman [*sic*] didn't have a case this magnitude it would not have gotten here to start with. [¶] No complaint could be filed in this particular courthouse unless it was of the monetary jurisdiction of the Superior Court."

Defendant did interpose an objection, stating: "The objection is that the clerk does not pass on the jurisdictional value of any case that is filed here in this courthouse." The court affirmed that such was the case, as also did plaintiff's counsel. The court pointed out that that minimum was $5,000 and that was all it had to be. Plaintiff's counsel again assented. Subsequently the court instructed the jury in the language of BAJI Instruction No. 14.62, "The amount of damages claimed, either by the written pleadings or in the argument of counsel must not be considered by you as evidence of reasonable compensation." It also at the conclusion of the specific instructions on liability and damages told the jury not to take cue from the judge in the language of BAJI Instruction No. 15.20. No prejudicial error appears from the foregoing incident. Any improper inference which plaintiff sought to raise was dispelled by the colloquy which ensued and the court's instructions. (See fn. 4 above.) Plaintiff's counsel acknowledged in connection with his argument on the motion for new trial, "Another point I would like to draw to the court's attention is this deal about the $5,000 jurisdictional limit. I don't think it has any bearing on the case. If I had to revise my argument, I must say I thought it was kind of stupid—I thought it favored the defendant."

Plaintiff's counsel then returned to discussing the evidence concerning the costs of further remedial medical treatment, the household help necessary, the profit sharing bonuses the plaintiff would lose, and the future pain she would suffer. He then continued to refer to the experts and dearth of experts, respectively, and stated, "You need to have experts here testifying. He says you don't need these people—if you don't need those people and if I couldn't bring them in Judge Cohn couldn't have let the gentlemen step through the front door." Defendant, who failed to object to the reference to the judge, now construes the foregoing passage as implying that the judge endorsed the testimony of the experts, rather than merely the plaintiff's right to present such testimony. Subsequent instructions of the court made it clear that the

jury were to determine the weight to be given the opinion of any expert in the light of his qualifications, credibility, the reason given for his opinion, and the relation between the assumptions on which the opinion was based and the facts actually established by the evidence. (See BAJI Nos. 2.40 and 2.42.) No prejudicial error has been demonstrated on the record by the reference to the judge's acknowledgment of the plaintiff's right to present expert testimony.

## G

It is recognized in the field of criminal law that it is misconduct to appeal to the jury to convict or impose a more serious punishment by reference to the defendant's right to secure review of any mistake the jury might make. In *People* v. *Morse* (1964) 60 Cal.2d 631 [36 Cal.Rptr. 201, 388 P.2d 33, 12 A.L.R.3d 810], the court stated, "Since the jury undertakes the task of assessing the penalty in the wide latitude of absolute discretion and in the absence of statutory guide lines, the suggestion that higher authorities will *review* its decision must profoundly affect it. Upon the delicate scale of unbounded determination we add a new but definite weight. The impact of the instruction must necessarily weaken the jury's own sense of responsibility. Yet nothing should be introduced to the jury to detract from its most careful consideration of the choice of penalty. That effect should not be adulterated by the infusion of foreign and deflecting factors." (60 Cal.2d at p. 649. See also *People* v. *Beggs* (1918) 178 Cal. 79, 92; and Annotation, Argument—Jury's Mistake Correctible (1965) 3 A.L.R.3d 1448.)

So here the defendant contends the plaintiff's counsel engaged in argument which was an invitation to irresponsibility on the part of the jurors in fixing the amount of damages. In the course of closing argument, counsel approached the question of general damages as follows: ". . . a rule of thumb that I have had in connection with most cases and you will read about that or understand it one way or the other is four times your special damages is pain and suffering, four times special damages here is five hundred thousand dollars. So, you will say to yourself, well, this attorney gets up there and tells me what values are and I say to myself, you know, I read in the paper about these values but I think it is awfully high but let's put it this way. I have known Judge Cohn for ten years and I know he is a fine jurist and he has done a great deal of service to the community by bringing these cases to trial early and this verdict, if it was excessive, wouldn't get out of this department."

Counsel objected and the court interposed an admonition.[9] The admonition did not touch the misleading aspect of plaintiff's argument. Plaintiff's counsel continued with the sophistry of linking his case to the judge (see part E above) in the following manner, "Mr. Cotter indicated that as far as the defense interests were concerned that if this case was tried in April 1975 we might be in a better position to judge it. Well, the reason Judge Cohn and the rest of the jurists around here have worked so hard is to see that a person gets equity because these persons would be without any money and they want to get these people to trial as soon as possible. This lady waited sixteen months, with no earnings, with no medical, nothing. But Mr. Cotter felt it advisable to keep her waiting a little longer and this is why the judges work hard in this area to get these cases to trial and are where they are and are to be complimented. [¶] Also, the reason is their personal pride in their profession." No objection was made to this suggestion that according to the hard-working judges the jurors were merely there to fix the amount of money to be awarded to the plaintiff.

## H

■ In reliance upon *Kenworthy v. State of California, supra,* 236 Cal.App.2d 378 (fn. 6 above), *Love* v. *Wolf, supra,* 226 Cal.App.2d 378 (fn. 5 above), and *Hoffman* v. *Brandt, supra,* 65 Cal.2d 549 (fn. 6 above), defendant contends that there was a deliberate course of action to distort the case before the jury in the particulars referred to above, and that any objections and admonitions would have been ineffective to curb the prejudice resulting from this torrent of misconduct. The foregoing analysis, however, demonstrates that with but few exceptions, the errors could have been checked when they first appeared by proper objection. Her contentions were answered in *Sabella* v. *Southern Pac. Co., supra,* where the court said, "Defendant urges us to ignore the rules of procedure relating to the 'magic words' of proper objection and admonition. But the procedure outlined above is not a meaningless

[9]The following ensued, "MR. COTTER: I object, this is completely an improper argument. THE COURT; You better not—MR. ALLARD: They have to go through trial and error. After this is through—MR. COTTER: I cite it as misconduct. THE COURT: Approach the bench. (Discussion off the record.) MR. ALLARD: I have been cautioned again. Another point that I would like to bring to your attention is as follows—THE COURT: Let me say this at this point. Ladies and gentlemen, you will be instructed more fully when I read the instructions and what the attorneys say is not evidence, it is argument. As I mentioned, you got your evidence from the witnesses and documents and stipulations that are in evidence and this is argument. Okay, proceed. MR. ALLARD: Thank you. There is a process involved—I will drop it at this point though . . . ."

ritual; it has been designed through judicial experience to prevent by timely words of caution the very problem with which we are here concerned. [¶] We emphasize again that the particular language used by counsel and the form or lack of objection by defendant in this case are not meant to serve as invariable guidelines for future reference. Each case must ultimately rest upon a court's view of the overall record, taking into account such factors, inter alia, as the nature and seriousness of the remarks and misconduct, the general atmosphere, including the judge's control of the trial, the likelihood of prejudicing the jury, and the efficacy of objection or admonition under all the circumstances." (70 Cal.2d at pp. 320-321, fn. omitted.) Tested by the foregoing standards we do not believe the misconduct now cited by plaintiff can of itself serve as a basis for reversing the judgment. The evidence of liability was clear. Defendant's attempt to avoid responsibility because of the obstruction of the view at the intersection was futile, and her attempt to show that the plaintiff was guilty of contributory negligence, if backed by some substantial evidence, fell far short of satisfying the test of preponderance of the evidence. (See *Cole* v. *State of California* (1970) 11 Cal.App.3d 671, 678-679 [90 Cal.Rptr. 74].) Any prejudice would only be reflected in the damages awarded. (See part IV below.)

We note, as did the court in *Sabella,* "Our conclusions should in no way be interpreted as condoning the deplorable conduct of plaintiff's counsel. However, punishment of counsel to the detriment of his client is not the function of the court. [Citation.] Intemperate and unprofessional conduct by counsel as is here involved runs a grave and unjustifiable risk of sacrificing an otherwise sound case for recovery, and as such is a disservice to a litigant. These same tactics, in another context, would likely result in a reversal." (70 Cal.2d at p. 321, fn. omitted.)[10]

## IV

In his specification of reasons for granting a new trial on the issue of damages alone, if plaintiff refused to consent to a reduction, the trial

[10]The persistence with which such misconduct as mars this case appears in the records we examine and in the reported cases, indicates that the present rules governing attorney misconduct are inadequate to check the temptation of the bar to squeeze out the last bit of unwarranted sympathy or prejudice. (See Stanbury, Cal. Trial and Appellate Practice (1958) pp. 603-605; and 23 Defense L.J. (1974) No. 3, pp. 259-260.) Perhaps the time has come to automatically reverse such cases, and give the litigant a right to establish to the satisfaction of a jury in an action against the overreaching attorney that but for his misconduct she would have received an award approaching that which was set aside.

judge pointed out: "The injuries and damages to plaintiff's lower lip probably had a value of $1,000.00 to $5,000.00. [¶] The dominant injury was to the right femur. [¶] Medical bills to date amounted to approximately $8,000.00. Future medical expenses, reasonably certain to be incurred, amounted to about $7,500.00-$10,000. Wage loss to date amounted to $11,900.00. Future wage loss through age 65, reduced to present cash value and taking inflation into account, was computed at $69,600.00. Total wage loss was determined to be $81,500.00. To this could be added profit sharing, Christmas bonuses, value of life insurance, drug plan, and the like. Plaintiff also presented a claim for housekeeping help. Plaintiff's total special damages, present and projected, amounted to about $110,000." The foregoing summary is sustained by evidence in the record.

Plaintiff's attorney suggested a $500,000 verdict in his argument, and the defendant suggested $37,346.45. The jury returned a verdict for $362,389.75, and the court reduced that sum to $280,000 on the basis that reasonable compensation for general damages for the injury to the femur would run from $75,000 to $165,000 for a maximum of $275,000 for that injury alone.

In *Beagle* v. *Vasold, supra,* the court observed, ". . . whatever manner of calculation is proposed by counsel or employed by the jury, the verdict must meet the test of reasonableness. . . . If the jury's award does not meet this test, the trial court has the duty to reduce it, and the appellate court has the authority to review the result." (65 Cal.2d at pp. 179-180, fn. omitted. See also *Cunningham* v. *Simpson* (1969) 1 Cal.3d 301, 308-311 [81 Cal.Rptr. 855, 461 P.2d 39]; *Hunton* v. *California Portland etc. Co.* (1944) 64 Cal.App.2d 876, 882-885 [149 P.2d 471]; and 4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, §§ 930 and 934, pp. 3212-3214 and 3216-3218.)

 Plaintiff contends that the award of $280,000 for a broken leg is unreasonable on its face. The trial court, however, summarized the evidence as follows: "As noted, the dominant injury was to the right femur. This consisted of a fracture. Because of a variety of medical reasons, the fracture did not heal. There is still a non union of bone. At least one additional surgery would be necessary. This would involve a fusion. The various risks attendant to one plaintiff's age would also be present. The import of medical testimony, from Drs. Schneider and Lillo, was that surgery was likely to be successful. Dr. Lillo spoke of a

70-80% success rate. The import of the testimony further was that although plaintiff would not be employable again, once surgery was successfully completed, she would be able to take care of herself. There was also the possibility of a second additional surgery to remove a pin." The evidence sustains those findings.

The rules governing appellate review of a claim of excessive damages were collated in *Seffert* v. *Los Angeles Transit Lines* (1961) 56 Cal.2d 498 [15 Cal.Rptr. 161, 364 P.2d 337], as follows: "The amount of damages is a fact question, first committed to the discretion of the jury and next to the discretion of the trial judge on a motion for new trial. They see and hear the witnesses and frequently, as in this case, see the injury and the impairment that has resulted therefrom. As a result, all presumptions are in favor of the decision of the trial court [citation]. The power of the appellate court differs materially from that of the trial court in passing on this question. An appellate court can interfere on the ground that the judgment is excessive only on the ground that the verdict is so large that, at first blush, it shocks the conscience and suggests passion, prejudice or corruption on the part of the jury." (56 Cal.2d at pp. 506-507. See also *Sabella* v. *Southern Pac. Co., supra,* 70 Cal.2d 311, 318, fn. 5; *Connolly* v. *Pre-Mixed Concrete Co., supra,* 49 Cal.2d 483, 487-488; *Zibbell* v. *Southern Pacific Co., supra,* 160 Cal. 237, 254; *Wilson* v. *Gilbert* (1972) 25 Cal.App.3d 607, 611-612 [102 Cal.Rptr. 31]; *Windeler* v. *Scheers Jewelers* (1970) 8 Cal.App.3d 844, 854 [88 Cal.Rptr. 39]; *Robison* v. *Atchison, Topeka & S. F. Ry. Co., supra,* 211 Cal.App.2d 280, 285-286; *Bondulich* v. *O. E. Anderson Co.* (1962) 210 Cal.App.2d 12, 18-19 [26 Cal.Rptr. 147]; *Ostertag* v. *Bethlehem etc. Corp., supra,* 65 Cal.App.2d 795, 805; *McCullough* v. *Langer, supra,* 23 Cal.App.2d 510, 526-527; and *Coppock* v. *Pacific Gas & Electric Co., supra,* 137 Cal.App. 80, 90-91.) "To say that a verdict has been influenced by passion and prejudice is but another way of saying that the verdict exceeds any amount justified by the evidence." (*Zibbell* v. *Southern Pacific Co., supra,* 160 Cal. 237, 254. See also *Windeler* v. *Scheers Jewelers, supra,* 8 Cal.App.3d 844, 854.)

Defendant points out that in *Hunton* v. *California Portland etc. Co., supra,* the appellate court reduced the damages to $10,000, although the trial court had reviewed the question of excessive damages in ruling on a motion for trial and already reduced a jury verdict of $40,000 to $18,000 (64 Cal.App.2d at p. 884). There, however, the court was not dealing with general damages for pain and suffering, but a recovery limited to the financial loss occasioned by the death of a minor child. In *Cunningham* v.

*Simpson, supra,* a divided court reversed a judgment of $25,000 for a slanderous statement and remanded the case for a new trial on the issue of damages. There the majority found that the only proved pecuniary loss was $300, and concluded it would not sustain the gross award despite the fact the jury could consider the plaintiff's loss of reputation, shame and hurt feelings (1 Cal.3d 301, 309-310).

In this case there is no substantial issue on the question of liability. (Cf. *Keena* v. *United Railroads, supra,* 197 Cal. 148, 156-160; and *Robledo* v. *City of Los Angeles, supra,* 252 Cal.App.2d 285, 296.) ▮ The general rule that when the trial judge has passed on the issue of excessive damages in connection with a motion for new trial, his conclusion in the matter will not be disturbed unless it is clearly wrong, applies in those cases where the trial judge has reduced the award and a remittitur has been accepted. (See *Sabella* v. *Southern Pac. Co., supra,* 70 Cal.2d 311, 318, fn. 5 [$115,500 to $80,000]; *Zibbell* v. *Southern Pacific Co., supra,* 160 Cal. 237, 254 [$100,000 to $70,000]; and *McCullough* v. *Langer, supra,* 23 Cal.App.2d 510 [$50,000 to $25,000].)

▮ The question of misconduct was argued before the trial judge, and it must be assumed that he considered all cognizable claims now made by defendant in appraising the propriety of the verdict. ". . . defendant is confronted with the rule that where the matter is presented to the trial court in support of a motion for new trial, the judge is in a better position than an appellate court to determine whether the verdict is due wholly or partially to misconduct of counsel and his conclusion will not be disturbed unless under all the circumstances it is plainly wrong. [Citations.]" (*Ferrate* v. *Key System Transit Lines, supra,* 165 Cal.App.2d 391, 396.)

The award as approved by the trial court, when viewed in the light of the plaintiff's special damages, is not so grossly excessive as to shock the moral sense so that the trial court as well as the jury can be deemed to have succumbed to passion or prejudice.

The judgment is affirmed.

Molinari, P. J., and Elkington, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied May 19, 1976.